# Illinois Official Reports

## Appellate Court

---

### *People v. Kronenberger*, 2014 IL App (1st) 110231

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER KRONENBERGER, Defendant-Appellant. |
| | |
| District & No. | First District, First Division<br>Docket No. 1-11-0231 |
| | |
| Filed | March 10, 2014 |
| Rehearing denied | April 14, 2014 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first-degree murder was upheld over his contention that the trial court erred in denying his motion to suppress his incriminating statements to the police, including a videotaped confession, since the use of the videotaped confession was a harmless duplication of the oral statement he made to the police, regardless of whether it was involuntary or a violation of his *Miranda* rights, and other evidence, such as telephone records and the testimony of other witnesses, corroborated the body of evidence that overwhelmingly established defendant's guilt. |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-2266; the Hon. Jorge L. Alonso, Judge, presiding. |
| | |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Todd T. McHenry, all of State Appellate Defender's Office, of Chicago, for appellant. |

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Annette Collins, Assistant State's Attorneys, of counsel), for the People.

| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Connors and Justice Hoffman concurred in the judgment and opinion. |

## OPINION

¶ 1 Following a jury trial in the circuit court of Cook County, defendant Christopher Kronenberger was convicted of first-degree murder and sentenced to 60 years of imprisonment. On appeal, the defendant argues that the trial court committed reversible error by denying his motion to suppress his incriminating statements to the police. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                          BACKGROUND

¶ 3 On October 12, 2005, Chicago police officers began investigating the death of Alexander Duran (Duran), whose body was found in the driver's seat of a burned vehicle in Marquette Park in Chicago. Duran's body was burned beyond recognition and the medical examiner was unable to determine the cause of death. During their investigation, the police obtained Duran's cellular telephone records, which revealed that Duran had received and made several calls before his death to a telephone number that was traced to the defendant. In January 2006, the police questioned the defendant regarding the telephone calls to Duran. The defendant invoked his right to an attorney and was later released.

¶ 4 In February 2006, police officers arrested Edward Kozeluh (Edward) on a drug charge unrelated to the instant case, and he volunteered to provide the police with information concerning Duran's murder. Edward informed the police that his son, Emil Kozeluh (Emil), and the defendant had talked about a murder that they committed by shooting a man in the head and burning him in his car. Edward told the police that another young man from the Marquette Park area was also involved in the crime. Upon further investigations, the police discovered from the defendant's telephone records that he had called David Pina's (Pina) residence on October 12, 2005. The police then questioned Pina, who informed them that the defendant had offered him money in exchange for burning a car in the park.

¶ 5 On December 26, 2006, shortly before midnight, Chicago police officers arrested the defendant at the Westmont police department, where he was detained on an unrelated matter,

and transported him to Area One Chicago police station for questioning regarding Duran's death. At approximately 3:30 a.m. on December 27, 2006, the defendant gave a videotaped statement in which he confessed that he had intended to rob Duran, but had not expected Emil to shoot the victim or set the fire. Subsequently, the defendant was charged with first-degree murder, armed robbery, burglary, arson, and concealment of homicidal death.

¶ 6 On May 16, 2007, the defendant filed a pretrial motion to suppress his incriminating statements to the police (motion to suppress), and filed an amended motion to suppress on May 22, 2007. In the amended motion to suppress, the defendant alleged that he was not provided *Miranda* warnings prior to interrogation, that the police did not scrupulously honor his invocation of the right to remain silent or his request for an attorney, and that his statements were obtained as a result of psychological and mental coercion.

¶ 7 On February 27, 2008, a hearing on the amended motion to suppress was held.[1] At the hearing, the defendant testified that on December 26, 2006, two police officers transported him from the Westmont police station to the Area One Chicago police station. En route, the police officers, without advising him of his *Miranda* rights, asked him a few questions about the homicide in Marquette Park. The defendant responded that he knew about the homicide because he had been questioned about it on a previous occasion. Upon arrival at Area One, the police placed him in an interview room, where he was not advised of his *Miranda* rights and was questioned by Detective Nolan–the same detective who had questioned him about the incident in January 2006.[2] The two transporting officers, who were waiting outside the interview room, entered the room and began questioning the defendant about the murder without first advising him of his rights. During the interrogation, the defendant asked to use a telephone, and the defendant was allowed to use one of the officers' cellular telephone to call his uncle. During the telephone call, the defendant asked his uncle to "grab a card out of [the defendant's] wallet, a lawyer's card," and the uncle indicated he would call the attorney on the defendant's behalf. After the call concluded, the police officers asked the defendant if he was requesting a lawyer, and that, if the defendant had asked for a lawyer, they would not be able to speak with him anymore. The defendant testified that, at some point in the interrogation, another officer entered the room and began questioning him without first giving *Miranda* warnings. According to the defendant, he spoke with a series of officers during the interrogation, spoke with the transporting officers more than once, and informed the transporting officers that he "didn't want to talk." However, the transporting officers' conversation with him did not end. The defendant also testified that he told another officer that he "didn't want to speak to him," but that officer told the defendant he was being a "pussy" and that he should "man up." The defendant then asked for an attorney and the officer left him alone in the interview room. After an hour, one of the transporting officers came into the interview room and brought him downstairs for fingerprinting. According to the defendant, the transporting officer told him that he had "[expletive] up" by not talking with the investigating officers, and that the defendant had made him "look bad" for refusing to talk to the police.

---

[1]Judge Lampkin presided over the hearing on the amended motion to suppress and the motion to reconsider the ruling denying the motion to suppress. Prior to trial, however, Judge Alonzo was assigned to the case.

[2]Police interrogation of the defendant in the interview room was memorialized by videotape.

After fingerprinting, the transporting officer told the defendant that he had "one more chance" to speak with the detectives and brought him back into the interview room. At the hearing, the defendant denied telling the transporting officer off camera that he wanted to speak to any of the officers. However, he acknowledged that once back in the interview room, he told an officer that he wanted to have a conversation about the murder in Marquette Park.

¶ 8       On cross-examination, the defendant testified that he was familiar with *Miranda* warnings, but did not recall whether any police officers advised him of his rights after he was placed in the interview room. He admitted that he did not ask for an attorney after calling his uncle, but that the officers continued to speak to him about the murder and the defendant continued to answer their questions. At no time after the transporting officers entered the interview room and began questioning him about the murder did the defendant request an attorney. Rather, it was only after 2 a.m., when he was speaking with Detective Brogan, that the defendant requested the presence of an attorney and the detective then left him alone in the interview room. In the interview room after fingerprinting, Detective Brogan asked him, "what's the story? You asked for a lawyer, so now you want to revoke that? You want to talk to me?" The defendant answered in the affirmative and conversed with the detective about the murder. On redirect, the defendant claimed that, after calling his uncle, one of the officers told him that the interview would only cease if the defendant started talking to them. He testified that he told the transporting officers several times that he "didn't want to talk to them" by saying he "was done."

¶ 9       Detective Gary Bush (Detective Bush) testified at the hearing that on December 26, 2006, he and Officer Joseph Biggane (Officer Biggane) arrested the defendant and transported him from the Westmont police station to Area One Chicago police station for questioning. They informed the defendant that he was under arrest for the murder of Duran and advised him of his *Miranda* rights in the police vehicle. The defendant acknowledged that he understood those rights. En route in the police vehicle, neither Detective Bush nor Officer Biggane questioned the defendant about Duran's murder; rather, the defendant asked whether the murder for which he was under arrest was the murder in Marquette Park. When they responded in the affirmative, the defendant continued to talk and stated that he and Emil had planned to rob the victim, but that the defendant did not know Emil was going to shoot him. At that point, Detective Bush told the defendant to wait to talk about the incident with the detectives at the police station. Upon arriving at Area One about midnight on December 27, 2006, they placed the defendant in an interview room, and Detective Bush notified Detectives Nolan and Murray of the defendant's arrival. Neither Detective Bush nor Officer Biggane stood outside the interview room listening to the defendant's conversation with Detectives Nolan and Murray. At about 1 a.m., Detective Bush and Officer Biggane returned to the interview room a second time and asked the defendant information required to complete the arrest report, and asked him "what was going on with the case and the content of what he had spoken to the detectives about prior to [them] being in the room." After 40 minutes, Detective Bush and Officer Biggane left the interview room. At about 1:43 a.m., Detective Brogan entered the interview room and spoke with the defendant. Shortly before 3 a.m., Detective Bush and Officer Biggane met with the defendant for the third time when they took him to the first-floor lockup area for processing. As they entered the stairwell, the defendant asked what was going on, to which they explained that he was being processed for his arrest. In response, the defendant said he "didn't want to go down for murder" and that he wanted to talk to the detectives. At that point,

Detective Bush stopped the defendant and told him that the investigating officers had informed Detective Bush and Officer Biggane that the defendant had invoked his right to an attorney. Detective Bush then readvised him of his *Miranda* rights, after which they continued walking down the stairs and the defendant stated that he wanted to speak with the detectives. Detective Bush then explained to the defendant that he would have to wait until after processing before he could speak with the detectives in the interview room. At about 3:20 a.m., after the defendant's arrest had been processed, Detective Bush and Officer Biggane escorted him back to the interview room, after which Detective Bush had no further contact with him. At the hearing, Detective Bush denied ever telling the defendant, during the time he was removed from the interview room for processing, that he "[expletive] up," that he made the detective "look bad," or that he only had "one more chance" to speak with the detectives. On cross-examination, Detective Bush testified that, when he reentered the interview room at about 1 a.m., he had been told by other officers that the defendant did not want to talk to them about the crime. Detective Bush clarified that "[i]t's not that he refused to talk to them. It's that he wasn't telling the truth."

¶ 10        Following arguments, the trial court denied the amended motion to suppress the videotaped statement. In its ruling, the trial court noted that it had reviewed the videotape and recounted in great detail the contents of the videotaped interrogation. The trial court found Detective Bush, one of the transporting officers, credible and that he had advised the defendant of his *Miranda* rights in the police vehicle. The trial court found that the defendant did not invoke his *Miranda* rights until 2:10 a.m., when he asked for an attorney, after which the police ceased conversing with him. The trial court further found that the defendant reinitiated conversation with the police and thereafter confessed to his involvement in the crime.

¶ 11        On December 29, 2008, the defendant filed a motion to reconsider the court's denial of the amended motion to suppress. On September 11, 2009, the trial court, after reexamining the videotaped interrogation, denied the motion to reconsider by adopting the court's earlier findings in denying the amended motion to suppress.

¶ 12        Prior to trial, the trial court granted the defendant's motion *in limine* to bar evidence of the defendant's prior juvenile conviction for first-degree murder, and the parties agreed to redact the videotape and transcripts to exclude any mention of gang affiliation and his prior juvenile record. The trial court also granted the State's motion *in limine* to prohibit the introduction of evidence at trial regarding, *inter alia*, the defendant's potential sentence or his lack of an adult criminal background.

¶ 13        On June 15, 2010, a jury trial commenced. The State presented the testimony of multiple witnesses. Testimonial evidence was presented that the victim, Duran, owned a green Cadillac and that his cellular telephone number was (708) 214-1978. Susan Hardcastle (Susan) testified that on October 12, 2005, she lived near Marquette Park and, at about 9 p.m., she smelled smoke, which she thought was burning rubber. Susan then walked to the park and noticed a car on fire and observed a young male teen exiting the park.

¶ 14        Pina testified that in October 2005, he was 15 years old, lived in the West Lawn neighborhood, and knew the defendant from the area. At the time, Pina's telephone number was (773) 306-0580. On October 12, 2005, between 6 p.m. and 7 p.m., the defendant called Pina and asked him to burn a car in exchange for $100. Pina agreed and they planned to meet at Marquette Park in an hour. About 10 or 15 minutes later, Pina began walking to a friend's house, but he saw the defendant and Emil traveling in a beige vehicle. Pina entered the vehicle

in which the defendant sat in the front passenger seat and Emil drove. Pina immediately smelled gasoline when he entered the car and observed a red gasoline can in the back. As the trio arrived at Marquette Park, they parked in front of a green Cadillac. As Emil exited the vehicle, Pina noticed that he had a gun in his waistband. Emil approached the green Cadillac, spoke with a man seated in the Cadillac, and entered the backseat of the green vehicle. The defendant then also exited the beige vehicle, approached the green Cadillac, and sat in the passenger seat of the Cadillac for a minute before returning to the beige vehicle. The defendant then accessed the glove box in the beige vehicle and moved things around as if he was retrieving something, after which he returned to the green Cadillac. As the defendant was walking back to the green Cadillac, Pina heard a gunshot and immediately exited the beige vehicle. He then saw Emil near the Cadillac "messing with a gun" by sliding it back and forth as if the gun was stuck. As Pina walked away, he heard an explosion from the area where he had just left. On cross-examination, Pina denied dousing the victim with gasoline or setting him on fire.

¶ 15    The parties then stipulated to telephone records which revealed that, on October 12, 2005, multiple calls between the defendant's and Duran's telephone numbers were made. Telephone records also revealed two calls between the defendant's telephone number and Pina's home telephone number on the date in question.

¶ 16    Edward testified on behalf of the State that he knew the defendant's name, but could not remember if he had ever met him. Edward admitted that he was a longtime heroin addict, but claimed to have no specific memory of being arrested for buying heroin on February 26, 2006. He could only recall "parts of" his conversations with the police after his arrest, including the police's questions about his son, Emil, and an individual named "Chris." However, Edward did not recall whether he talked to the police about a murder that occurred in Marquette Park. He stated that he did not have a clear recollection of testifying before a grand jury regarding the instant case because he was "dope sick" on that day. At trial, when the State confronted Edward with portions of his grand jury testimony, he testified that he did not recall giving those statements. In his grand jury testimony, Edward had testified that he was previously present for a conversation between Emil and the defendant, in which the defendant said he "popped" Duran in the head, he "blew off" Duran's head, and he was shocked to see Duran still alive to wipe blood and gasoline off his own face. At trial, Edward acknowledged that he was not coerced or threatened into providing his grand jury testimony.

¶ 17    The State also presented testimony from Officer William Whelehan (Officer Whelehan), who testified that Edward did not appear to be under the influence of drugs at the time of his arrest for drug possession in February 2006. During processing at the police station, Edward volunteered information about the murder in Marquette Park, after which Officer Whelehan notified Area One detectives and Detective Nolan arrived to speak with Edward. Assistant State's Attorney Thomas Simpson (ASA Simpson) also testified that, on February 27, 2006, he met and spoke with Edward prior to bringing him before the grand jury. Edward, who did not appear to be under the influence of drugs or exhibiting symptoms of withdrawal from drugs, told ASA Simpson about the conversation he had heard between Emil and the defendant regarding Duran's murder. Edward then later testified before the grand jury regarding the same information.

¶ 18    Detectives Nolan, Bush, and Brogan testified on behalf of the State with regard to their involvement in the investigation and interrogation of the defendant. During each detective's

trial testimony, the jury was shown portions of their videotaped conversations with the defendant.[3] Detective Nolan specifically testified to his and Detective Murray's 30-minute conversation with the defendant that occurred at about 12:26 a.m. on December 27, 2006.

¶ 19   Detective Bush's trial testimony with regard to his and Officer Biggane's transport of the defendant to Area One police station on the evening of December 26, 2006, paralleled his testimony at the hearing on the defendant's amended motion to suppress. Detective Bush explained that, while en route to Area One, the defendant, after being advised of his *Miranda* rights, confessed to his involvement in the crime and detailed the events leading up to Duran's death. Detective Bush testified to his 1 a.m. conversation with the defendant, which lasted approximately 40 minutes. Detective Bush stated that at approximately 2:53 a.m., he and Officer Biggane took the defendant out of the interview room and headed downstairs for the processing of his arrest. Detective Bush's trial testimony regarding the defendant's statements to him at the time he was removed from the interview room for processing, mirrored his testimony at the hearing on the amended motion to suppress.

¶ 20   Detective Brogan testified that on December 27, 2006, he spoke with the defendant twice in the interview room–the first conversation at 1:43 a.m. in the presence of Detective Murray; and the second conversation at 3:28 a.m., during which the defendant confessed that he had intended to rob Duran, but had not expected Emil to shoot the victim or set the fire.

¶ 21   The State then rested and the trial court denied the defendant's motion for a directed finding. The defense then presented the testimony of two witnesses. Forensic scientist Lauren Schubert (Schubert) testified that she tested DNA retrieved from a jacket and a condom that were found at the crime scene, which did not match either the defendant's or Duran's DNA profile. Sergeant Jose Lopez (Sergeant Lopez) of the Chicago police department testified that he had assisted Detective Nolan in the murder investigation. Sergeant Lopez testified that Pina had told the police that the defendant had offered him $200, rather than $100 as reflected in Pina's trial testimony, to burn the car.

¶ 22   During jury deliberations, the court received a jury note requesting the transcript of the videotaped statement. Following a discussion with the parties, the trial court allowed the jury to view the redacted version of the videotaped statement which contained subtitles on the screen. Subsequently, the jury found the defendant guilty of first-degree murder.

¶ 23   On July 15, 2010, the defendant filed a motion for a new trial, which was supplemented in a separate motion on September 8, 2010. On November 2, 2010, the trial court denied the defendant's posttrial motions. On January 3, 2011, the trial court sentenced the defendant to 60 years of imprisonment. On January 3, 2011, the defendant filed a notice of appeal.

¶ 24                                                    ANALYSIS
¶ 25   We determine whether the trial court erred in denying the defendant's amended motion to suppress his incriminating statements to the police.

¶ 26   The defendant argues that the trial court erred in denying his amended motion to suppress, because the police obtained his incriminating statements by violating his *Miranda* rights and

---

[3]The jury was shown a redacted version of the videotaped conversations, which removed references to the defendant's gang affiliation and his previous juvenile murder conviction. The redacted videotape contained subtitle transcriptions.

police coercion precluded him from either voluntarily waiving his *Miranda* rights or voluntarily confessing. Specifically, he contends that he had twice invoked his right to remain silent during police interrogations, which was not scrupulously honored by the police. He further maintains that the detectives' coercive statements nullified the partial *Miranda* warnings he was given by the police. The defendant argues that the admission of his involuntary confession at trial violated his due process of law and that the trial court's error was not harmless.

¶ 27    The State counters that the trial court properly denied the amended motion to suppress, where the police had advised the defendant of his *Miranda* rights; the defendant waived them; the defendant did not invoke his right to silence; the police ceased questioning after the defendant requested an attorney; and the defendant reinitiated conversation with the police and voluntarily confessed to the crime. The State argues that the police did not coerce or threaten the defendant and that his confession was fully voluntary. Even if the admission of the defendant's incriminating statements at trial was erroneous, the State contends that it was harmless error in light of the overwhelming evidence of the defendant's guilt.

¶ 28    On review of a trial court's ruling on a motion to suppress, great deference is afforded to the trial court's factual findings, and the reviewing court will reverse those findings only if they are against the manifest weight of the evidence. *People v. Lopez*, 2013 IL App (1st) 111819, ¶ 17. "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." (Internal quotation marks omitted.) *Id.* However, this court reviews *de novo* the ultimate question of whether or not the motion to suppress evidence should have been granted. *Id.* Further, in reviewing the court's ruling on a motion to suppress, "it is proper for us to consider the testimony adduced at trial, as well as at the suppression hearing." *People v. Slater*, 228 Ill. 2d 137, 149 (2008).

¶ 29    The defendant argues that the totality of the circumstances showed that he did not voluntarily waive his *Miranda* rights. He first points out that, in the beginning of the videotaped interrogation, Detective Murray only partially advised him of his *Miranda* rights. Our review of the videotaped interrogation reveals that, in the interview room at approximately 12:26 a.m. on December 27, 2006, Detective Murray advised the defendant of his *Miranda* rights, but failed to mention that an attorney would be appointed if the defendant could not afford one. At the hearing on the amended motion to suppress, the trial court found that Detective Bush, one of the transporting officers, had previously advised the defendant of his *Miranda* rights in the police vehicle while en route to the police station. The trial court also found Detective Bush credible in that, prior to the defendant's 3:28 a.m. videotaped confession, he had readvised the defendant of his *Miranda* rights when the defendant made certain statements to the detective after the defendant was brought out of the interview room for processing.

¶ 30    We find that the trial court's findings were supported by the evidence. The evidence shows that the defendant was provided *Miranda* warnings on three occasions after he was arrested. At the hearing on the amended motion to suppress and at trial, Detective Bush testified that he advised the defendant of his rights upon arresting him, and that, shortly before 3 a.m., he mirandized the defendant again at the police station when the defendant was removed from the interview room for processing. During his testimony, Detective Bush recited the *Miranda* warnings from memory–which included the advisement that an attorney would be appointed if

- 8 -

the defendant could not afford one. While the defendant testified at the hearing that he was never advised of his *Miranda* rights during police interrogation, such testimony was belied by the videotaped interrogation in which Detective Murray gave him *Miranda* warnings at 12:26 a.m. It was within the province of the trial court, which had viewed the videotaped interrogation and heard the evidence, to find Detective Bush credible. See *People v. Rhonda F.*, 289 Ill. App. 3d 148, 157-58 (1997) (the credibility of witnesses is within the province of the trial court). Because the trial court found Detective Bush credible, and thus found that the defendant was fully advised of his *Miranda* rights during transport to the police station and again shortly before 3 a.m., prior to the giving of his videotaped confession at about 3:28 a.m., any deficiency in Detective Murray's 12:26 a.m. *Miranda* advisement did not affect his ability to voluntarily waive his rights to make incriminating statements to the police during the transport or police interrogation. Therefore, we find that the defendant's argument on this basis must fail.

¶ 31    The defendant argues that, notwithstanding the omission in Detective Murray's *Miranda* advisement, his videotaped confession should have been suppressed where the police violated his constitutional privilege against self-incrimination by failing to scrupulously honor his invocations of the right to remain silent. Specifically, he contends that, during police interrogation, he twice invoked his right to remain silent–at 12:57 a.m. and 2:07 a.m.–which the detectives did not scrupulously honor.

¶ 32    The State counters that the defendant did not unequivocally and unambiguously invoke his right to silence at either 12:57 a.m. or 2:07 a.m.

¶ 33    The United States and Illinois Constitutions provide that no person shall be compelled in any criminal case to be a witness against himself. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10. Once a suspect indicates "in any manner" prior to or during police questioning that he wishes to remain silent, the interrogation must cease. *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966); *Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975) (an invocation of the right to silence must be "scrupulously honored" (internal quotation marks omitted)). However, an invocation of the right to silence must be unambiguous, unequivocal and clear. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). "This right to silence may be invoked either verbally or through conduct that clearly indicates a desire to end all questioning." *People v. Diaz*, 377 Ill. App. 3d 339, 347 (2007); see *People v. Nielson*, 187 Ill. 2d 271, 284 (1999) (finding the defendant had invoked his right to remain silent when he placed his hands over his ears, turned his head, and chanted " 'nah nah nah' "). "If verbal, the individual's demand to end the interrogation must be specific." *Diaz*, 377 Ill. App. 3d at 347.

¶ 34    The videotaped interrogation shows that, between 12:26 a.m. and 12:59 a.m. on December 27, 2006, Detectives Nolan and Murray interrogated the defendant in an interview room. Our review of the videotape reveals that during the conversation, the defendant was advised of his right to silence and right to counsel, he acknowledged that he understood his rights, and he indicated his desire to have a conversation with the detectives. During this conversation, the defendant at times answered the detectives' questions, at times did not answer, and at times lamented on the dire circumstances in which he now found himself. At about 12:55 a.m., Detective Murray allowed the defendant to call his uncle from the detective's mobile telephone. After the telephone call, at about 12:57 a.m., Detective Murray questioned the defendant about what he had asked his uncle to look for in a wallet at home. When the defendant responded, "I don't know," Detective Murray asked whether he wanted to keep

talking. When the defendant did not verbalize a response, Detective Murray urged him to respond "yes or no." Detective Murray then asked, "You don't want to talk to me anymore?" and "We done talking?" to which the defendant said nothing. Detective Murray then engaged in the following dialogue:

> "Q. [Detective Murray]: Come on, you told Uncle Mick then he asked you if you wanted a lawyer, right?
>
> A. [Defendant]: No.
>
> Q. No? Okay. If you don't want to talk anymore I'm not going to force you to talk to me. Remember this I'm going to be in periodically throughout the night while I'm putting–while he's calling the State's Attorney, alright.
>
> A. (Indicating)
>
> Q. And periodically through the night if you want to talk to me again I have no problem with that.
>
> A. What's your name?
>
> Q. My name is Murray. I just want you to know, okay. I really look forward to talking to you because I really thought you were going to do the right thing here.
>
> A. I don't know what you guys [*sic*] intentions are that's all.
>
> Q. Listen man, I have not lied to you once. He has not lied to you once. Our intentions are to put people away who committed murder, okay? Did you play a role?
>
> A. Then why am I here?
>
> Q. Why are you here? Because you played a role in it. Well then proof [*sic*] us wrong and tell us what happened. You sat in the front seat. I'll give you a little time to think. I'll–we'll be back to see you in a little bit."

¶ 35　　The defendant contends that he had invoked his right to remain silent by shaking and nodding his head when Detective Murray asked, as highlighted above, whether he wanted to keep talking, whether "you don't want to talk to me anymore" and whether "we done talking." Based on our careful and repeated review of this portion of the videotaped interrogation, we saw that the defendant made some very slight movements of his head but even after repeated viewing, it is unclear whether he actually nodded or shook his head in response to these questions. We cannot conclude that the defendant's head movements clearly indicated a desire to end all questioning. It certainly did not rise to the level of an unambiguous and unequivocal invocation of the right to silence. Thus, we find that the evidence supported the trial court's finding that the defendant did not invoke his right to remain silent at 12:57 a.m. during his conversation with Detective Murray.

¶ 36　　Nor do we find that the evidence supports the defendant's argument that he invoked his right to silence at 2:07 a.m. during interrogation by Detective Brogan. The videotaped interrogation shows that, between 1:43 a.m. and 1:57 a.m., Detective Brogan and Detective Murray, who entered the room at 1:52 a.m., engaged in conversation with the defendant. During the 14-minute conversation, Detective Brogan tried to convince the defendant to tell the truth about what happened. At some point during the conversation, the defendant denied shooting Duran and denied seeing who shot him. At about 1:57 a.m., Detectives Brogan and Murray left the defendant in the interview room alone. At about 2:07 a.m., Detective Brogan reentered the interview room to ask if the defendant needed to use the bathroom, to which the defendant responded by shaking his head. The following dialogue then ensued:

"Q. [Detective Brogan]: No? Are you done talking to me? Are you done talking to all of us?

A. Yeah.

Q. Yeah. Why are you being a pussy dude, seriously? These [expletive] are all tricking you out, putting you in the trick bag, putting it all on you. This is your [expletive] chance to flip the script and now you're just sitting here, [expletive] crying. Why don't you man up, dude? *** You want to take that weight for these [expletive]?

A. (Indicating)

Q. That's the path you're headed down."

¶ 37    In the case at bar, at the hearing on the amended motion to suppress, the trial court noted that the above-quoted dialogue, in which the defendant answered "yeah," was the "closest thing to invoking his right to remain silent, although he doesn't say I don't want to talk anymore." We agree with the trial court on this point. Carefully viewing the highlighted portion of the videotaped interrogation within the context of the surrounding circumstances leading up to the defendant's response, we find that the defendant did not unambiguously invoke his right to silence. See *People v. Cole*, 172 Ill. 2d 85, 96-97 (1996) (defendant's statement that " 'I don't want to talk to you guys' " was not an invocation of silence, where the surrounding circumstances indicated that he actually meant he did not wish to speak with the FBI agents, rather than all police personnel). Rather, the context surrounding Detective Brogan's earlier conversation–between 1:43 a.m. and 1:57 a.m.–centered on getting the defendant to tell the truth and his "story" about what had occurred. During that earlier conversation, the defendant had supplied some information about the crime, including his denial that he was the shooter. During the 2:07 a.m. conversation, Detective Brogan reentered the interview room to verify whether the defendant had more to add regarding the crime, by asking "Are you done talking to me?" and "Are you done talking to all of us?" to which the defendant responded "yeah." We find that the defendant's response, without specificity, did not indicate a desire to end all questioning so as to rise to the level of an unambiguous and unequivocal invocation of the right to silence. See *Diaz*, 377 Ill. App. 3d at 347 ("[i]f verbal, the individual's demand to end the interrogation must be specific"). It is unclear from the defendant's response whether he wished to invoke his constitutional right to silence or whether he, after having spoken to Detective Brogan in the earlier 14-minute conversation, had nothing else to tell the detectives. See *People v. Smith*, 152 Ill. 2d 229, 255-56 (1992) (defendant's statement of " 'leave me alone' " was not an invocation of right to silence); *People v. Aldridge*, 68 Ill. App. 3d 181, 186-88 (1979) (defendant's statements to police that " 'you've got enough details right now that fits the crime so let's hang this up,' " " 'you've got everything you need here now,' " and " 'there's nothing I want to add to it,' " were not invocation of right to silence but rather a reluctance to convey to the police the details of the offense), *aff'd*, 79 Ill. 2d 87 (1980); *People v. Pierce*, 223 Ill. App. 3d 423, 429-30 (1991) (no invocation of right triggered where defendant stated, " 'You've got all the stuff there right now. You don't need no more really.' "). Thus, we find that the trial court's determination that the defendant did not invoke his right to silence during his 2:07 a.m. conversation with Detective Brogan, was not against the manifest weight of the evidence.

¶ 38    Because we find that the defendant did not invoke his right to silence at either 12:57 a.m. or 2:07 a.m., we need not address his arguments that the police failed to scrupulously honor his invocations. Nor do we need to address the defendant's arguments that the trial court's error in

- 11 -

failing to find that he had invoked his right to remain silent was critical because it "increased the coercive nature of the interrogation and weighed against a finding that he voluntarily waived his rights," as well as "rendered Detective Bush's account of what happened off-camera incredible."

¶ 39　　Even assuming, *arguendo*, that the defendant had invoked his right to silence during the interrogation at 12:57 a.m. and 2:07 a.m., we find that suppression of his later videotaped confession was not warranted. As the trial court correctly found, the defendant invoked his *Miranda* rights for the first time when he requested an attorney during the conversation with Detective Brogan at 2:09 a.m., which was scrupulously honored. Our review of the videotaped interrogation shows that, at 2:09 a.m., during a three-minute conversation (from 2:07 a.m. to 2:10 a.m.) between Detective Brogan and the defendant, the defendant asked, "Why can't I have a lawyer here with me?" Detective Brogan clarified by asking, "You want a lawyer?" to which the defendant responded "Yeah." Detective Brogan then stated, "Okay. I can't talk to you anymore," stood up from a sitting position and tried to exit the interview room. The defendant then called after him, asking "Why can't you talk to me?" to which Detective Brogan stated that "Once you ask for a lawyer it's your constitutional right to have one. *** I can't talk to you without the presence of your lawyer from now on, that's it. *** So if you want a lawyer, you're good to go."

¶ 40　　We find that, as demonstrated by the exchange highlighted above, the defendant unequivocally invoked his right to counsel at 2:09 a.m., which the police scrupulously honored. The videotape further shows that, after invoking his right to counsel, the defendant was left alone in the interview room until 2:53 a.m., when Detective Bush took him out of the room for processing. According to Detective Bush's testimony, which the trial court found credible at the hearing on the amended motion to suppress, the defendant reinitiated conversation with the police by stating that he "didn't want to go down for murder" and that he wanted to talk to the detectives. Detective Bush then readvised him of his *Miranda* rights, after which they continued walking down the stairs and the defendant again stated that he wanted to speak with the detectives. Detective Bush then explained to the defendant that he would have to wait until after processing before he could speak with the detectives in the interview room. The videotape reveals that, at 3:28 a.m., the defendant was brought back into the interview room, where Detective Brogan joined him at about 3:30 a.m. and spoke with him for about 33 minutes. At the beginning of the 3:30 a.m. conversation, the defendant admitted that he reinitiated conversation with the police, and acknowledged that he was revoking his right to counsel. The defendant then proceeded to give details of his involvement in the crime, and confessed that he had intended to rob Duran, but had not expected Emil to shoot the victim or set the fire. Based on this evidence, we find that, even had the defendant unambiguously and unequivocally invoked his right to silence at 12:57 a.m. and 2:07 a.m., and the police failed to scrupulously honor those requests, the later invocation of his right to counsel was scrupulously honored by the police and the subsequent videotaped confession was admissible, where it was made after the defendant had been readvised of his rights and he had reinitiated conversation with the police. See *People v. Crotty*, 394 Ill. App. 3d 651, 655 (2009) (once a defendant invokes his right to counsel, the police cannot interrogate him further unless the defendant initiates further communication, exchanges, or conversations with the police); see generally *People v. Scott*, 159 Ill. App. 3d 459, 465 (1987) (although the defendant's initial unwarned

statements were obtained in violation of *Miranda*, his subsequent confession, after administration of *Miranda* warnings, was voluntary and admissible).

¶ 41 The defendant makes a number of arguments that his videotaped confession to the police was given involuntarily, because the interrogation techniques used by police detectives to obtain it included repeated threats, coercion and deception. Such repeated threats and coercion, he asserts, precluded him from voluntarily waiving his *Miranda* rights or otherwise voluntarily providing a statement. He further contends that certain comments made by the detectives, to the extent that they contradicted and undermined his right to remain silent and right to counsel, nullified the *Miranda* warnings provided to him. Specifically, he points to comments made by the detectives during interrogation, such as "your silence speaks volumes here. Your silence is making you a dirty gang banging [expletive]," "[you will] swing for this," and "the only [expletive] way you're going to get any of us out of here is to [expletive] tell us what happened."

¶ 42 An accused who waives his *Miranda* rights must do so voluntarily, knowingly, and intelligently. *People v. Bernasco*, 138 Ill. 2d 349, 355 (1990). In determining whether a *Miranda* waiver is valid, the relevant inquiry is: (1) whether there was a free, uncoerced choice; and (2) whether there was awareness of the right and the consequences of abandoning it. *Id.* at 354.

¶ 43 Viewing the complained-of statements in context of the entirety of the interrogation, we find that the first two quoted remarks by the detectives did not undermine or conflict with his right to silence, as the defendant suggests. These two remarks, when viewed in context, show the detectives' explanation to the defendant that the only version of the events that the police possessed came from Emil's father, Edward, who had placed all of the blame for the crime on the defendant. Indeed, our review of the videotaped interrogation reveals that the detectives repeatedly tried to convince the defendant to tell "the truth," to tell his "story," to take this opportunity to "flip the script," to "help" himself, and to not let others tell his side of the "story," while the defendant repeatedly lamented over the seriousness of the situation by making statements that it was a "lose-lose situation," and that he was "[expletive]," "done," going to get "locked up," "going to jail," and that his "future" was "gone." Nor do we find any of the statements to be a nullification of the *Miranda* warnings provided to him. The defendant cites *State v. Luckett*, 993 A.2d 25 (Md. 2010), for support. First, we note that decisions rendered by courts of other jurisdictions are not binding on this court. *People v. Harris*, 2011 IL App (1st) 103382, ¶ 14. Second, we find *Luckett* to be factually distinguishable from the case at bar. In *Luckett*, police provided *Miranda* warnings, which were nullified when the officer contradicted those rights with further " 'clarifications' " of those rights that were incorrect as a matter of law. *Luckett*, 993 A.2d at 37-38. Unlike *Luckett*, here, detectives told the defendant throughout the interrogation that he had no obligation to answer questions, that they could leave him alone if he wished, and that the defendant could choose to have the presence of counsel at any time. We find that the quoted remarks by the police did not "nullify" the defendant's *Miranda* warnings but, rather, were a zealous attempt to convince the defendant to tell the truth. As the videotaped interrogation shows, the defendant indeed invoked his right to counsel shortly after the complained-of comment. Further, based on our examination of the videotape showing the defendant's demeanor and Detective Bush's testimony that he readmonished the defendant of his rights on their way to processing, we reject the defendant's argument that the police impermissibly engaged in a "question first and

- 13 -

warn later" tactic to obtain his inculpatory statement. See *Missouri v. Seibert*, 542 U.S. 600, 611-12 (2004). Thus, the defendant's argument regarding the voluntariness of his *Miranda* waiver on these bases must fail.

¶ 44    The defendant further argues that, aside from the detectives' disregard for his *Miranda* rights, their multiple threats, misrepresentations, and promises of leniency resulted in his involuntary statement which was admitted at trial in violation of his due process rights. Specifically, he characterized the same first two above-quoted comments, as well as remarks by the detectives that he might avoid an "L-I-F-E" sentence and "save" himself if he told them what happened, as threats made by the detectives. He further contends that the detectives misrepresented to him that his postarrest silence would make him look guilty and would result in a natural life sentence or death sentence, and that he could talk his way out of "doing a lot of time" by giving a statement "because there's not a [S]tate's [A]ttorney in the world that once they read this file is going to offer a reduction in sentence down the line for anything." The defendant also posits that Detective Murray's statement that the detective would love to go before a judge and personally guarantee that the defendant was not the shooter was akin to an impermissible promise of leniency.

¶ 45    The State denies that any of the remarks made by the detectives constituted threats or promises of leniency, and argues that the defendant's videotaped confession was fully voluntary.

¶ 46    The due process clause of the fourteenth amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. The relevant legal inquiry is whether the defendant's confession was voluntary. *People v. Richardson*, 234 Ill. 2d 233, 252 (2009). In determining whether a statement is voluntary, "a court must consider the totality of the circumstances of the particular case; no single factor is dispositive." *Id.* at 253. "Factors to consider include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the presence of *Miranda* warnings; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises." *Id.* at 253-54.

¶ 47    Based on our examination of the videotaped statement, we find that the defendant's portrayal of the interrogation as containing repeated threats and coercion to be an out-of-context view of the detectives' comments. The running theme of the bulk of the interrogation was that the police tried to convince the defendant to tell his version of what happened and tried to appeal to his sense of doing the "right thing." Throughout the interrogation, the detectives told the defendant that they *knew* he was involved in the crime but did not think he was the shooter, and that they thought Emil was actually the mastermind behind the robbery and killing. We find that the detectives' references to an "L-I-F-E" sentence, to "save" himself, and to avoid doing "a lot of time" only highlighted the reality that he could avoid the maximum sentence if he was not the shooter. Likewise, we find that the police did not offer any inducement or promises of leniency to obtain the defendant's confession. Rather, the alleged "promise of leniency," when viewed in context on the videotape, shows that Detective Murray informed the defendant that the detective did not "cut deals," that the detective's objective was to have the "absolute truth in knowing that [he was] putting the right person in jail," and that he wanted to be able to state with certainty that the defendant did not personally discharge the firearm. See *People v. Lee*, 2012 IL App (1st)

- 14 -

101851, ¶ 36 (finding the police's statement that " 'isn't it better to be known as a robber instead of a murderer of old men?' " did not constitute a promise of leniency because it lacked any suggestion of a specific benefit that would ensue from the defendant's confession). Like *Lee*, here, Detective Murray's statement that he wanted to be able to tell a judge with certainty that the defendant was not the shooter did not constitute a promise of leniency, where there lacked any suggestion of a specific benefit that would ensue from his confession. Indeed, during the interrogation, detectives never misrepresented to the defendant that he would escape legal consequences if he confessed, but instead, they candidly told the defendant that "no doubt" he was in a bad situation, that no one would get a "free walk," but that he should do the "right thing" by telling the police what had occurred. Moreover, we find that, at the time of questioning, the defendant, who was 22 years old, was no stranger to the criminal justice system and was well aware of the severity of the circumstances in which he found himself. Under the totality of the circumstances, we find that the defendant's subsequent videotaped confession was voluntary.

¶ 48    Even assuming, *arguendo*, that the defendant's inculpatory statement was taken in derogation of his *Miranda* rights or was somehow involuntary, the use of his videotaped confession at trial was harmless error, where it was merely duplicative of the oral incriminating statement he gave to the police during his transport to Area One after his arrest–which was testified to by Detective Bush at trial. It is well established that the testimony of this one witness was itself sufficient to convict the defendant. Other trial evidence, such as telephone records and Pina's and Edward's testimony, also corroborated the body of evidence that established the defendant's guilt. Although we find no error in the admission of the defendant's videotaped confession, we also find that the evidence presented at trial, aside from the videotaped confession, overwhelmingly established the defendant's guilt. Accordingly, we find that any error in the admission of the videotaped confession was harmless. Therefore, we hold that the trial court properly denied the defendant's amended motion to suppress.

¶ 49    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 50    Affirmed.