NOTICE
Decision filed 11/01/19. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2019 IL App (5th) 160001-U

NO. 5-16-0001

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the |
| ) | Circuit Court of |
| Plaintiff-Appellee, ) | St. Clair County. |
| ) | |
| v. ) | No. 14-CF-989 |
| ) | |
| ERIC M. HILL, ) | Honorable |
| ) | Robert B. Haida, |
| Defendant-Appellant. ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Boie concurred in the judgment.

**ORDER**

¶ 1     *Held:* The defendant's conviction for first-degree murder is affirmed where the trial court did not err in denying his motion to suppress; where he was not denied effective assistance of counsel; where the court did not consider improper factors in aggravation; and where the defendant's sentence is not excessive.

¶ 2     This is a direct appeal from the circuit court of St. Clair County. The defendant, Eric M. Hill, was convicted of first-degree murder and found to have personally discharged a firearm proximately causing death. On December 7, 2015, he was sentenced to an enhanced sentence of 60 years' imprisonment to be followed by 3 years of mandatory supervised release (MSR). The defendant raises four points on appeal:

1

(1) that the trial court erred in denying his motion to suppress a video recording of his July 13, 2014, interrogation; (2) that he was denied effective assistance of counsel; (3) that the court committed plain error by considering four improper factors in aggravation; and (4) that the court plainly erred in rendering an excessive sentence. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On August 1, 2014, the defendant was charged by indictment with one count of first-degree murder. It was alleged that the defendant shot the victim, Marcus Harris, multiple times without justification and with the intent to kill or do great bodily harm, thereby causing his death.[1]

¶ 5    On May 8, 2015, defense counsel filed a motion to suppress statements made by the defendant, including those made during an interrogation that took place on July 13, 2014. The motion alleged the defendant had invoked his rights to counsel and to remain silent, but his statements invoking his rights were ignored.

¶ 6    A hearing on the defendant's motion to suppress was held on May 28, 2015, during which defense counsel indicated she would proceed only on the defendant's statements invoking his right to silence. In response to the motion, the State argued that the first statement was not heard by interviewing officers, the officers honored the second

---

[1]As reflected in a notice of intent filed on June 15, 2015, the State sought a mandatory sentencing enhancement pursuant to 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012) of 25 years to life imprisonment based on the fact that the defendant personally discharged a firearm proximately causing death to another person.

demand by stopping the interrogation, and the defendant had been the one to reinitiate conversation after the break in questioning.

¶ 7    Illinois State Police (ISP) Special Agent Benjamin Koch testified at the hearing as to the following. Koch did not hear the defendant initially say he did not want to talk anymore because they were having a "rhythmic back and forth." However, after the second time the defendant said he did not want to talk anymore, the officers stopped the interview and left the room. When Koch returned to the interview room to see if the defendant needed to use the restroom and to inform him that he was going to be transported to the county jail, the defendant started talking again. At that point, Koch told the defendant they could not talk anymore unless he revoked his right to silence. The defendant stated that he wanted to speak to the officers again, which Koch confirmed three or four times before proceeding with the interrogation.

¶ 8    On cross-examination, Koch acknowledged that during the interrogation, the defendant made more ambiguous statements such as "I'm through, man. I got nothing else to say," and "I didn't do nothing to that man, so I'm through with it," but that the officers continued the interrogation because he continued to talk and engage them. Koch also admitted that after he briefly left the room, he returned and asked the defendant if he wanted to talk to him, but he again said he was through and did not want to talk anymore. After the defendant said he did not want to talk about anything at all, Koch left the room for an hour, leaving the defendant alone in the interview room. When the defendant asked to use the restroom, Koch escorted him to the restroom; thereafter, they returned to

3

the interview room, Koch then told him that a trooper was there to take him to the county jail, and he started talking again.

¶ 9    Koch did not believe that the defendant had unequivocally invoked his right to silence by indicating he was done talking but continuing to engage with the officers.

¶ 10    ISP Trooper Derek Weh also testified at the motion to suppress hearing as follows. Although he heard the defendant say he did not want to talk anymore twice on the video, he only heard it once in person. He could not hear the first time the defendant said it in person because there was "a general flow of conversation." If he had heard the defendant say he did not want to talk anymore the first time, Weh answered that he would have informed Koch that the defendant no longer wished to speak to them and that they needed to end the interview. When the defendant said he did not want to talk the second time and the officers heard it, they left the room. Weh also said that the defendant continued to talk after his first statement that he did not want to talk anymore.

¶ 11    Additionally, ISP Special Agent Matt Renner testified at the hearing that on two separate occasions, the defendant told him off-camera to tell the victim's family that he was sorry.

¶ 12    Lastly, the defendant testified at the hearing. The defendant admitted that he understood the *Miranda* rights as the officers went through them at the beginning of the interrogation. According to the defendant, he knocked on the door while the officers were out of the room during the break in questioning because he needed to use the restroom. When he heard Koch tell other officers that he was going to be charged with murder as they were walking back from the restroom to the interview room, he spoke to

4

the agents because he wanted to know why. However, the defendant acknowledged on cross-examination that he started talking to Koch again because he wanted to convince him that he was not involved in the victim's murder.

¶ 13   The trial court denied the motion to suppress, ruling that there had been probable cause to support the defendant's arrest that the defendant had been Mirandized prior to questioning and voluntarily waived his rights, and that no statements were obtained in violation of his constitutional rights.

¶ 14   Prior to trial, defense counsel requested that the defendant's statements in which he unsuccessfully attempted to invoke his right to remain silent not be redacted from the interrogation video shown to the jury. Counsel specifically requested, "As part of the flow of the conversation, we would ask that those be left in when he wants to stop the conversation and it doesn't stop." However, counsel requested that the State not be allowed to argue that the defendant's attempts to invoke his rights were evidence of guilt. Counsel subsequently requested that the portions of the video when the officers left the room for a while pursuant to the defendant invoking his right to remain silent, and when the officers told the defendant they could not talk to him because he invoked his right to silence, be redacted, but she wanted the rest of the interrogation to remain a part of the video. The trial court granted defense counsel's request, and so the jury saw the defendant's statements indicating he wanted to go home and he had nothing else to say. However, the defendant's statements that he did not wish to talk anymore were not shown to the jury.

5

¶ 15     On October 12, 2015, a five-day jury trial commenced.  The State first played the victim's 9-1-1 call for the jury, which was followed by testimony from the 9-1-1 dispatcher who received the call.  The dispatcher testified that at 1:52 a.m. on July 13, 2014, the victim called 9-1-1 to report he had been shot nine times.  The victim gave his name, phone number, and location of 50th Street and Caseyville Avenue in Washington Park.  The victim said he was dying, and he begged for someone to help him.  The victim also told the 9-1-1 dispatcher that he was "shot by Little E."

¶ 16     Washington Park Police Officer James Boyd testified that he responded to the location provided by the victim and found him lying in the roadway.  Officer Boyd was unable to help the victim, but he spoke with him and was able to obtain his name and date of birth.  When Officer Boyd asked the victim who shot him, he replied, "Little E."  The victim later died at the hospital.  Officer Boyd recovered the victim's cell phone from the scene.

¶ 17     Johnnie Harris, the victim's brother, testified that he went to the police station at around 10 a.m. on July 13, 2014, in order to provide the police with information he thought would be helpful.  Johnnie[2] gave the police a picture taken on July 4, 2014, which depicted the victim with several other people including the defendant.  Johnnie also gave the police a record of calls made to and from the victim's phone.  Further, Johnnie told the police that he heard there were a lot of problems going on in Washington Park at the time of the shooting, in some of which the victim might have been involved.

_____

[2]Because Johnnie Harris shares a last name with the victim, we will refer to Johnnie by his first name for ease of reference.  No familiarity or disrespect is intended.

6

¶ 18    The State then called Mary McKinney as a witness.  McKinney testified that she lived at 1715 North 50th Street in Washington Park, which was about a block north of where the victim's body was found.  Around the time of the murder, she witnessed an unidentified young black male wearing light pants and a white top walking down the street carrying a light canvas bag.  She later saw this man walking south on 50th Street with another individual on a bicycle.  She knew someone with the nickname of Little E from the neighborhood and identified him as the defendant, both in court and in the July 4 photograph.  McKinney recalled that she had seen the defendant riding a bike around the neighborhood.

¶ 19    The victim's friend, Quinitria Johnson, also testified.  She knew the defendant for years from the neighborhood.  Johnson testified that the defendant had been hanging out with the victim for a few weeks before he died, both by themselves and in groups.  She identified the defendant as the person she knew as Little E in court, and she identified him and the victim in the July 4 photograph.  Johnson saw the defendant and the victim together at Royal Land Foods on July 11, 2014, and she thought everything seemed fine between them.

¶ 20    Brianna Brown, another friend of the victim, testified that she saw the victim the day before the shooting at Royal Land Foods, where the two had a conversation.  Brown said the defendant was the only Little E she knew; she identified him in court and further identified both him and the victim in the July 4 photograph.  Brown testified that she had seen the defendant five or six times with the victim, both by themselves and in groups.

¶ 21   TracFone Wireless employee Winston Chambers testified that the defendant was the subscriber for the phone number (618) 514-****.  Records reflected that on July 13, 2014, the defendant's phone received two incoming calls from the victim's cell phone, which had the number (314) 598-****; the first was at 1:44 a.m. for two minutes and the second was at 1:47 a.m. for one minute.  Those phone calls were either answered or the caller left a "very long voice mail," because the TracFone system did not record unanswered calls.  Chambers also testified that the defendant's phone made, sent, and received other calls and text messages throughout the night of the shooting.

¶ 22   A Sprint employee testified about the victim's telephone records, which reflected calls to and from the defendant's phone number in the days leading up to, and on the night of, the shooting.  The records further revealed the victim called the defendant's number eight times before placing the 9-1-1 call at 1:52 a.m. on July 13, 2014.

¶ 23   ISP Special Agent Michael Swindle's testimony indicated that at some point in the investigation, police officers believed that the defendant was the individual who the victim referred to as Little E.  Agent Swindle obtained an address for the defendant and responded to his residence on the afternoon of July 13, 2014.  The defendant let Agent Swindle into the residence; Swindle recalled that he was calm and relaxed as he told him that some ISP investigators wanted to speak to him.  Shortly thereafter, Special Agent Koch, along with other investigators, arrived at the defendant's residence and Agent Swindle stepped out.  The defendant consented to a home search and agreed to go to the ISP headquarters for an interview.  At some point prior to the interview, officers discovered that some of the phone calls and text messages reflected in the victim's cell

8

phone records for the days leading up to and on the night of the shooting were to or from the defendant's phone.

¶ 24 Agent Koch testified regarding the July 13 and 14, 2014, interrogations of the defendant. During Koch's testimony, he admitted that the officers used deception as an interview technique with the defendant. However, he confirmed that the defendant was read his *Miranda* rights, his biological needs were met, no physical force was used against him, and that no threats or promises were made in order to get him to speak to the officers. The defendant's written waivers of his *Miranda* rights were introduced into evidence.

¶ 25 The defendant's interrogation was video recorded, and partially redacted versions of the videos were shown to the jury at trial. In pertinent part, the videos revealed the following. Once the defendant arrived at the ISP headquarters, he was placed in an interview room with Special Agent Koch and Trooper Weh. Koch then informed the defendant of his *Miranda* rights. The ensuing interrogation took place between approximately 6:28 p.m. on July 13, 2014, and 12:45 a.m. on July 14, 2014.

¶ 26 The officers began by asking the defendant what he had been doing from about 6 p.m. on July 12, 2014, up to the time of the interview. The defendant responded that he was at his mother's house until 2:30 or 3 p.m. on July 12, where he rode bicycles with his children and took a nap. His parents then took them to his apartment, where he stayed for the rest of the night; he did not have access to a bicycle while he was at his residence. The defendant went to sleep around 8 or 9 p.m. with his kids. He woke up around midnight to take the children to the bathroom but then they went back to sleep until

9

around 7 a.m. on July 13. The defendant and his kids then went back to his mother's house to relax and take a nap; he woke up from his nap around 3 or 4 p.m. and had one drink.

¶ 27    The officers then asked if the defendant knew the victim or shared a bicycle with him; the defendant responded in the negative. When the officers momentarily left the interview room, the defendant said to himself, "I don't even know nobody with that name." Upon their return, they showed the defendant the picture of himself, the victim, and other people on July 4, 2014; he said he did not know the victim's name but thought he was called "Black." The defendant remembered that the picture was taken on the Fourth of July. When the officers told him that the victim had been shot, he acted surprised.

¶ 28    The defendant said he did not know the victim's real name, but he indicated that they knew each other from around the neighborhood. Although the victim had his telephone number, he did not remember the last time the victim had called him. He acknowledged speaking to the victim in person the day before, when the two walked past each other, but he could not remember where that exchange took place. He insisted that people called him "E," but not Little E.

¶ 29    Agent Koch showed the defendant copies of the victim's telephone records, which listed multiple calls from the victim's phone to the defendant's between 1:39 and 1:49 a.m. on July 13. When the defendant acted surprised that the victim had called him, Koch confirmed that was the case and said that the victim's next call was to 9-1-1.

¶ 30    Koch then told the defendant that the 1:43 a.m. call lasted for two minutes and that he must have spoken to someone, but the defendant persisted that it was not him or his kids who talked to the victim.  He then consented to a search of his cell phone.  The defendant again told the officers he did not remember the victim calling him the night before and said that he would not have gone outside to meet the victim because he was already in bed with his kids at the time the calls took place.  When asked whether he remembered why the victim called him, the defendant said he did not know.  He repeatedly denied speaking to the victim, but admitted his phone was with him all night.

¶ 31    Koch began to ask, "So if somebody saw you two together," but the defendant interrupted, asking "who" and later saying, "Ain't nobody seen me with him."  When the officers asked what his cell phone's global positioning system data would show as to his whereabouts on the night of the shooting, he answered, "Whatever.  It's gonna say I was at home."  After being informed that the victim told police the defendant shot him, he said he was not there when the victim was shot.

¶ 32    Upon being told that the victim had died after being shot nine times, the defendant replied, "I hate it for him; I didn't do it."  The defendant then said, "I wanna go home, 'cause I didn't do nothin' "; Koch replied, "You shot him and you killed him.  That's what he told a cop and 9-1-1."  The defendant again told the officers he was not the shooter and said, "I wanna go home, so what's up?"  After repeating that he was home in bed with his kids and did not talk to or shoot the victim, he said, "I'm done."  He then continued, "Nothing else to say.  I got nothing else to say."  He insisted, "I didn't do nothing to that man."

¶ 33    The defendant then asked if he could go home, to which Koch answered in the negative. The defendant insisted he never had any problems with the victim.

¶ 34    There was a significant break in the interrogation, during which time the defendant was escorted to the restroom. After the break, Koch again stated that the victim expressed as he was dying that the defendant shot him, to which the defendant persisted that he was not with the victim and did not shoot him. The defendant stated, "Whatever he was into, I don't know nothing about it."

¶ 35    Trooper Weh then left the interview room and was replaced by Agent Renner. Koch suggested that only one set of facts could be true—either the defendant spoke to the victim on his phone on July 13 or someone else had the defendant's phone and spoke to the victim when he called that night. The defendant still maintained that he did not talk to the victim, he was not there when the victim was shot, and he was home with his children, but Koch said that was not what the evidence showed.

¶ 36    When Koch left the interview room, Renner told the defendant that the evidence proved he was at the scene of the shooting. Renner suggested that the officers were giving him a chance to tell his side of the story. Koch returned to the interrogation room with a DNA testing kit and asked the defendant to consent to providing a DNA sample; the defendant agreed. After Koch took the swabs, he left the room, and the defendant spoke to Renner alone. Renner later left the interview room for approximately 90 seconds, and when he returned, he told the defendant that a trooper would be taking him to the St. Clair County jail based on the evidence the police had against him. The

defendant repeated his version of what he did on July 12 and 13 for Renner and told him to confirm the story with people on the street.

¶ 37　The defendant said he talked with and texted his girlfriend throughout the night of July 12-13, 2014. However, he contended the reception in his bedroom was poor, so he could text in there, but he had to move to other rooms in the apartment to make calls. He continuously asserted that he did not speak to or shoot the victim and that he was in bed with his kids when the shooting occurred.

¶ 38　Renner then asked whether the defendant had encountered the victim with a woman at Royal Land Foods a couple of nights prior to the interview. The defendant said he did not know what the officer was talking about and stated the last time he had been with the victim was a couple days prior, when "walking past the store like we always do," he asked the victim what was up. The defendant also said he had seen the victim a couple of times in the past few days, but he did not run into anyone with the victim.

¶ 39　Koch told the defendant that he needed to tell the absolute truth. The defendant stated that if anyone said he or she saw him with the victim during the time of the shooting, it was not true.

¶ 40　After the back and forth continued for some time, the defendant was again escorted to the restroom. Koch subsequently asked if the defendant had been drunk the night before; the defendant replied that he drank a half-pint of Country Club vodka, and if he was drunk, then he was "asleep drunk." Asked again about his trip to Royal Land Foods the day before, the defendant said he walked there from his mother's house.

Although he could not remember how he left or who all was there, he recalled that he returned to his mother's house afterwards where his mother, father, and children were all present. The officers noted that the defendant's story varied from the first time he told them what happened.

¶ 41 While the defendant felt bad for the victim, he insisted he was not the one who shot him. The officers accused the defendant of lying. Koch asserted the victim was at the store at closing time—10 p.m.—and that the defendant had been there with him, which conflicted with his statement as to his actions in the past 24 hours. The defendant thought he was there during the daytime and did not remember the victim being there. The officers pressed the defendant to give them the name of someone who could corroborate his story, but he refused.

¶ 42 The defendant again told the officers that people called him E, but not Little E, and that the man who people called Little E had been dead for a while. He then agreed that some people might call him Little E.

¶ 43 There was another break in the questioning, and then the officers played the victim's 9-1-1 call for the defendant. As the officers increased pressure on the defendant, they noticed he was beginning to show emotion. They then told him that people had identified him as Little E in the July 4 photograph. Further, the officers told him to show remorse to help his outcome; instead, he asked if he could go home. They yelled at him and told him to be a man by accepting responsibility. Koch stepped out of the interview twice, leaving Renner alone with the defendant. Thereafter, Koch returned to the room,

14

told the defendant to stand and face the wall with his hands behind his back, and handcuffed him.

¶ 44 Koch told the defendant that a trooper was going to take him to county jail. Although the defendant responded, Koch could not hear what he said. When the defendant continued to speak inaudibly, Renner had his handcuffs removed, told him not to whisper, and they sat back in the interview room in front of the camera. The defendant wanted to know what was going to happen to him. Upon being told that he would be taken to the county jail and charged with first-degree murder, he said he was not a bad person. He was then transported to jail.

¶ 45 The following day, July 14, 2014, Koch and Renner spoke with the defendant at the St. Clair County jail for about 17 minutes. The defendant was re-Mirandized and agreed to talk to the officers. When Koch asked him why he wanted to tell the victim's family he was sorry, he said he hated what happened to the victim, but he did not know what happened to him. The defendant still insisted he was not present for the shooting. He told the agents he had told them the truth and that was all he had to say.

¶ 46 Trooper Weh and Agent Renner also testified about the interrogation. According to Renner, the officers were preparing to have the defendant transported to the jail when he whispered to tell the victim's family that he was sorry. The defendant did not repeat this statement when they turned the video camera back on, but he told Renner the same thing as he was being placed in a police vehicle. The officers went to the jail and asked him about his off-camera statements the next day in the second interview, which was when he said he was only expressing sympathy but had not been involved.

15

¶ 47    A forensic pathologist testified that the victim sustained several gunshot wounds that could have been caused by 10 projectiles. The wounds to the victim's chest and abdomen caused his death. The victim was pronounced dead at the hospital at 4:19 a.m. on July 13, 2014.

¶ 48    ISP Sergeant Michael Grist testified that 10 shell casings and 6 projectile fragments were recovered at the scene, which the officers processed while the area was lit by a working streetlight. A former ISP forensic scientist testified that all cartridge casings were fired from the same gun, and all the fragments, as well as the bullet recovered from the victim's body, were fired from the same gun, but he did not analyze whether the bullets or fragments came from the same gun that fired the casings.

¶ 49    Sergeant Michael Lybarger of the Edwardsville Police Department testified as to data recovered from the defendant's and the victim's phones. In the victim's phone, the defendant's number was listed as Little E, and that was the only Little E listed in the victim's contacts.

¶ 50    After the State rested its case, the defense filed a motion for directed verdict, which was denied. The defendant did not testify or present any evidence in his defense.

¶ 51    The jury found the defendant guilty of first-degree murder and that he personally discharged a firearm proximately causing death.

¶ 52    The defendant subsequently filed a posttrial motion for a new trial arguing, *inter alia*, that the trial court erred in denying his motion to suppress his statements made during the interrogation. The posttrial motion was denied by the court.

16

¶ 53  During the sentencing phase of the defendant's trial, the victim's mother testified and read her victim impact statement.  The victim left behind a girlfriend, four young children, parents, siblings, nieces, and nephews, who were all "in pain and hurt" as a result of the victim's death.  The victim's mother testified that he loved his children, and they missed him.

¶ 54  Defense counsel then presented the testimony of the defendant's brother, who said the defendant was a good father raising three boys on his own and a good person who helped others in the community.  He did not think the defendant was a violent person. The defendant's brother and mother were trying to care for his children at the time, but it was difficult as his mother had recently had a stroke.

¶ 55  The State argued that the defendant should be sentenced to 30 years' imprisonment for first-degree murder and 25 years' imprisonment pursuant to the firearm sentencing enhancement.  The State asserted the defendant had a "history of criminal activity" and caused serious, irreparable harm by taking a son, father, and brother from his family.  The State also highlighted the manner of the victim's death by arguing, "A man who shoots a friend nine to ten times and leaves him bleeding on the side of the road like an animal is a man who needs to be incapacitated from the community[.]" Accordingly, the State maintained the sentence it sought was necessary for deterrence and to incapacitate the defendant since he could not be rehabilitated.

¶ 56  Defense counsel stated that the defendant was sorry this happened to the victim, but he had no information about it.  The defendant did not have a violent past, and he had only recently incurred a gun charge after some friends handed him a gun when they were

confronted by the police. Defense counsel contended the minimum sentence of 45 years' imprisonment would make the defendant approximately 75 years old when he got out of prison, so the purposes of deterrence and incapacitation would be sufficiently addressed by the minimum. During his allocution statement, the defendant said, "I'm sorry what happened to him, to Marcus Harris."

¶ 57    The trial court found that the defendant had a prior criminal history, caused serious harm, and needed a longer sentence to deter others. It found no factors in mitigation, statutory or otherwise. The court made the following relevant statements:

> "I want to speak to Marcus Harris' family, actually to all the family members here. These things—these tragic events that result in the loss of life are a plague on our community. And I don't have to tell you folks that live—have lived or still live in that—in the community where this occurred in Washington Park, in the greater Washington Park area, I don't have to tell you that. You very likely experience that or feel that every day.
> And tragedies like this end up having a significant effect. Eric Hill did this. That's what the jury decided. And his family will suffer, too.
> And I know that you folks, you've suffered the greatest loss, and I'm not suggesting otherwise. But this tragedy and these events perpetrated by Mr. Hill end up punishing everyone who knew the people involved in this case.
> It's been suggested that a stiff sentence will somehow help you get over or deal with your loss. And I say this to the Harris family. I have suffered personal loss of a significant person in my life, and I know for a fact that you don't ever get over it. So I know for a fact that whatever I do today may give you some comfort that the violent acts which took the life of your loved one have been responded to by a system that's been put in place by a society to do that. At the same time, I do know that every day for the rest of your lives you're going to mourn the loss of your loved one. And I take that to heart. And I appreciate to a certain extent what you are going through.
> * * *
> But what I am going to impose is, based upon a consideration of the facts and circumstances of the case, including the fact that this was a murder unlike many others that I have experienced or seen in my time being involved in the criminal justice system in this region. One could fairly describe it as an execution. It certainly wasn't an accident. Sometimes people die from graze wounds to a leg or a shoulder or a neck. This was clearly not that.

18

And the fact that Mr. Harris was able to survive long enough to make the call is nothing short of—nothing short of a miracle, I suspect."

¶ 58   The trial court then sentenced the defendant to 35 years' imprisonment as to first-degree murder plus an additional 25 years' imprisonment pursuant to the firearm sentencing enhancement, to be followed by 3 years of MSR.

¶ 59   The defendant filed his notice of appeal on December 23, 2015.

¶ 60                               II. ANALYSIS

¶ 61   On appeal, the defendant makes four contentions.  First, he argues that the trial court erred in denying his motion to suppress the video recording of his July 13, 2014, interrogation.  Second, he asserts that he was denied effective assistance of counsel where counsel failed to request that his unsuccessful attempts to invoke his right to remain silent be redacted from the interrogation video shown to the jury.  Third, he contends that the court considered four improper factors in aggravation.  Fourth, he maintains that the court plainly erred in rendering an excessive sentence.

¶ 62                          A. Motion to Suppress

¶ 63   The first issue raised by the defendant is whether the trial court erred in denying his motion to suppress the video recording of his July 13, 2014, interrogation.  He specifically maintains that he invoked his right to silence during the interrogation, his assertions were not scrupulously honored, and the court's error in admitting the interrogation video was not harmless beyond a reasonable doubt.  In contrast, the State argues most of the defendant's statements were not sufficiently clear and unambiguous so as to invoke his right to silence, the unambiguous assertion was scrupulously honored

19

until the defendant reinitiated conversation with the officers, and any error was harmless beyond a reasonable doubt.

¶ 64    In reviewing a circuit court's ruling on a motion to suppress evidence, including statements, we apply a two-part standard of review. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). We review *de novo* the court's ultimate legal ruling as to whether the suppression is warranted. *Id.* A court's findings of fact and credibility determinations are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *Id.* The reason is because the circuit court is in a better position to determine and weigh the credibility of the witnesses, observe their demeanor, and resolve conflicts in the testimony. *Id.* A judgment is against the manifest weight of the evidence where the opposite conclusion is apparent or when the findings are unreasonable, arbitrary, or not based on evidence. *People v. Lopez*, 2013 IL App (1st) 111819, ¶ 17.

¶ 65    The United States and Illinois Constitutions provide that no person should be compelled in any criminal case to be a witness against himself. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10. To protect this right, interrogation of an accused must cease once the accused indicates in any manner and at any time prior to or during a custodial interrogation that he wishes to remain silent. *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005). Any statement taken after the individual invokes the right to remain silent cannot be other than the product of compulsion, subtle or otherwise. *Id.* However, an assertion of the right to remain silent must be clear, unambiguous, and unequivocal. *People v. Kronenberger*, 2014 IL App (1st) 110231, ¶ 33. This right may be invoked

20

either verbally or through conduct clearly indicating a desire to cease all questioning. *Id*. If verbal, the demand must be specific. *Id*. Whether a statement constitutes a clear and unequivocal assertion depends on how a reasonable police officer would perceive the suspect's words. See *Davis v. United States*, 512 U.S. 452, 459 (1994); see also *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (the same rules apply to assertion of either right provided under *Miranda*). Moreover, we examine statements in the factual context of their utterance. *People v. Milner*, 123 Ill. App. 3d 656, 660 (1984).

¶ 66    Here, the defendant points to several statements that he alleges were assertions of his right to silence. We can separate these statements into two categories: (1) ambiguous statements that fell short of invoking his right to silence that were shown to the jury and (2) the defendant's clear and unequivocal assertion of his right that was not shown to the jury but is a part of the record on appeal.

¶ 67    With respect to the first category of the defendant's statements, the record reveals the following. A little over one hour and five minutes into the interrogation, the defendant repeatedly said he wanted to go home. At around one hour and nine minutes into the interrogation, he made statements indicating he had nothing else to say, he was "through with it," he was ready to go home, and he wanted to call his "people." We find that none of the foregoing statements rose to the level of a clear and unequivocal assertion of his right to silence, as they are comparable to those held ambiguous by other courts. See *id.* at 658, 660-61 (" 'I'm tired, I can't answer no more' " held to be ambiguous); see also *State v. Murphy*, 747 N.E.2d 765, 778-79 (Ohio 2001) (defendant's statement that he was " 'ready to quit talking, and *** go home, too' " found to be

21

ambiguous); *State v. McCorkendale*, 979 P.2d 1239, 1247-48 (Kan. 1999) (" 'So that's all I [got] to say' " at the end of a response to a question held to be ambiguous), *overruled on other grounds by State v. King*, 204 P.3d 585 (Kan. 2009).

¶ 68   Subsequently, the defendant stated the following:

> "Alright, alright, alright, alright, alright. You saying that. I'm through with it, *I don't wanna talk no more*. Uh, something, we, we, you have to do something. Shit. I know damn well I ain't done nothing to no-damn-body. Shit. Crazy as hell. So, matter of fact, I'm telling you [inaudible] home, with my kids. You feeling me? That's what I do—me and my kids. [Inaudible.] Shit. Gonna put me into something crazy. Can I go home? Right now?" (Emphasis added.)

¶ 69   At issue is how a reasonable police officer would have perceived the preceding statement. At the motion to suppress hearing, Agent Koch testified that they did not hear the defendant say, "I don't wanna talk no more," during the interrogation because they were having a "rhythmic back and forth." Further, Trooper Weh testified that he did not hear the statement during the interrogation because there was "a general flow of conversation" but heard it when he watched the video recording of it. Implicit in its ruling denying the motion to suppress, the trial court found the foregoing testimony to be credible, and we defer to the court's credibility determinations.

¶ 70   Construing the defendant's statement in the context of a reasonable officer's perception, we find it was ambiguous and as not sufficient to invoke his right to silence. The video recording of the interrogation reveals the defendant was growing increasingly agitated at this point in the interview. He began raising his voice, banging his hands on the table, and moving his face closer to Koch's face as the two were sitting across the table from each other. Moreover, the defendant did not stop talking after he uttered the

22

words in question—the quoted language demonstrates he continued to deny involvement in the crime and assert his innocence. Under such circumstances, we find the defendant's ambiguous statement was not specific enough to express his desire to end the interrogation by asserting his right to remain silent. See *Milner*, 123 Ill. App. 3d at 660 (we examine statements in the factual context of their utterance); see also *People v. Williams*, 233 P.3d 1000, 1023 (Cal. 2010) (" 'I don't want to talk about it' " held to be ambiguous, as it was an expression of defendant's frustration with the police's failure to accept his repeated assertion that he did not know the victim); *State v. Thomas*, 673 N.W.2d 897, 908 (Neb. 2004) (" 'I'm done talkin' man, I know what I did, how can ya'll keep on saying I did it' " found to be ambiguous, as defendant interrupted an accusation that he had committed the crime and may have been responding in frustration to the police's unwillingness to believe that he was not involved in the crime; also, he asked a question requesting further information), *abrogated on other grounds by State v. Rogers*, 760 N.W.2d 35 (Neb. 2009). Because the defendant's statements were insufficient to invoke his right to silence, the police were not required to end the interrogation. See *Berghuis*, 560 U.S. at 381.

¶ 71 As to the second category, *i.e.*, the defendant's statement actually invoking his right to silence, the record reveals that he continued talking after the preceding statements, so the officers continued with their interrogation. Then, the defendant unequivocally said, "I don't wanna talk no more," which caused the officers to stop questioning him and leave the interview room. In this context, where the defendant's statement was unqualified, not accompanied by heightened emotions or followed by his

23

continued protestations of innocence, and was a specific statement expressing his desire to not speak with the officers anymore, the defendant clearly and unequivocally invoked his right to silence. The officers acted properly in scrupulously honoring the defendant's assertion by ending the interrogation and leaving the interview room.

¶ 72 Nevertheless, the defendant next argues his assertion on his right was not scrupulously honored when the officers resumed the interrogation approximately 42.5 minutes after he invoked his right to silence. In *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981),[3] the United States Supreme Court clarified that, after an accused has invoked a right provided to him under *Miranda*, the police cannot demonstrate a valid waiver of that right simply by proving he responded to further police-initiated questioning. *People v. Mandoline*, 2017 IL App (2d) 150511, ¶ 102. Thus, an accused who has indicated that he wishes to invoke his right to remain silent is not subject to further interrogation by the police unless the accused himself initiates further exchanges, communications, or discussion with the police. *Id.*; *People v. Outlaw*, 388 Ill. App. 3d 1072, 1079 (2009).

> "Whether a defendant initiated further communication depends on whether the defendant 'evinced a willingness and a desire for a generalized discussion about the investigation' or was 'merely a necessary inquiry arising out of the incidents of the custodial relationship.' [Citation.] Specifically, requests to use the bathroom or for a drink of water do not evince a willingness and a desire for a generalized discussion about the investigation. [Citation.]" *Outlaw*, 388 Ill. App. 3d at 1083.

---

[3]We note the majority of cases cited in this section pertain to an accused's *Miranda* right to counsel because the parties have not provided, and our independent research has not revealed, cases discussing this issue with respect to an individual's *Miranda* right to remain silent. However, the United States Supreme Court has reiterated that courts should apply the same standards as to both of the rights afforded a defendant under *Miranda*. *Berghuis*, 560 U.S. at 381.

¶ 73   Courts employ a two-part test in determining whether a statement made after a defendant has invoked his right to remain silent is admissible. *Mandoline*, 2017 IL App (2d) 150511, ¶ 103.   The first step is to determine who reinitiated discussion after defendant asserted his right—defendant or the police. *Id.*   If the police caused the discussion to resume, then *Edwards* prohibits admission of statements made in response to the further interrogation; if defendant reinitiated the conversation, then we proceed to the second step. *Id.*   The second step is to determine whether, in view of the totality of the circumstances, including the fact that defendant reopened the conversation, defendant knowingly, voluntarily, and intelligently waived his right to silence during the additional interrogation. *Id.*   The State has the burden of demonstrating, by a preponderance of the evidence and considering the totality of the circumstances, whether the events following defendant's assertion of his right to silence indicates a waiver of such right. *People v. Smith*, 306 Ill. App. 3d 82, 87 (1999).   We will affirm the trial court's determination on the matter so long as it is not manifestly erroneous. *Id.*

¶ 74   With respect to the first step in our analysis, the record reveals the following. After the defendant indicated he did not want to talk to the officers anymore, they stopped questioning and left the interview room.  The defendant sat in the room alone for approximately 42.5 minutes; during this time, he was informed he was being arrested for first-degree murder and subsequently escorted to the restroom.  When the defendant and Koch returned to the interview room, Koch confirmed with the defendant that they did not speak while they were outside the view of the camera.  The defendant then said he had a question.  He asked, "What you talking about me getting charged with something I

25

didn't do?" Koch informed him that they could not talk to him because he had invoked his constitutional right. He then engaged in a colloquy as to whether the defendant wanted to resume the interrogation. Koch explicitly told the defendant he did not have to talk to them. When Koch asked the defendant if he wanted to talk to him, the defendant responded, "Yes, to say I didn't do no murder, yeah. Because you talking about some, way down to take me to county and stuff." After the officer explained to him what was going to happen, the defendant continued claiming his innocence, to which Koch asked, "Do you want to talk to me?" The defendant affirmatively said, "yes." At that point, the officers proceeded with the interrogation.

¶ 75    Koch testified at the motion to suppress hearing that he returned to the interview room to see if the defendant needed to use the restroom and to inform him that he was going to be transported to the county jail. After the defendant was escorted to the restroom and they returned to the interview room, the defendant started talking again. At that point, Koch told the defendant they could not talk anymore unless he revoked his right to silence. The defendant stated he wanted to speak to the officers again, which Koch confirmed three or four times before proceeding with the interrogation.

¶ 76    The defendant admitted at the hearing that he understood the *Miranda* rights as the officers went through them at the beginning of the interrogation. According to the defendant, he knocked on the door while the officers were out of the room during the break in questioning because he needed to use the restroom. When he heard Koch tell other officers that he was going to be charged with murder as they were walking back from the restroom to the interview room, he spoke to the agents because he wanted to

26

know why. However, the defendant acknowledged on cross-examination that he started talking to Koch again because he wanted to convince him that he was not involved in the victim's murder.

¶ 77 Based on the foregoing, we find the defendant reinitiated discussion with the officers after the break following his assertion of his right to silence. The defendant's question, "What you talking about me getting charged with something I didn't do?" was sufficient to evince a willingness and desire to resume a generalized discussion about the investigation; it was not merely a request for a drink or to use the restroom. The defendant's testimony at the motion to suppress hearing confirms this was the case. Further, Koch advised the defendant that he was unable to speak with him because he had invoked his right to remain silent and confirmed the defendant's intent to revoke that right multiple times prior to questioning him again.

¶ 78 Having found that the defendant reinitiated conversation after he invoked his right to silence, we now must determine whether, in light of the totality of the circumstances, he knowingly, voluntarily, and intelligently waived such right during the additional interrogation. We find that he did. As previously stated, Koch advised the defendant that because he had invoked his right to silence, the officers could no longer speak to him. After the defendant indicated at least twice that he wanted to talk to the officers again, Koch confirmed the defendant's intentions to waive his right to silence three or four times before proceeding with the interrogation. The record contains no indication that the defendant no longer understood his *Miranda* rights, and the *Miranda* warnings read to him were not so stale and remote for us to find he was unaware of the right he was

waiving. See *People v. Garcia*, 165 Ill. 2d 409, 425-26 (1995). As such, the defendant knowingly, voluntarily, and intelligently waived his right to remain silent during the additional interrogation; the statements made during the additional interrogation were admissible; and the trial court's denial of the defendant's request to suppress them was not manifestly erroneous.[4]

¶ 79                              B. Ineffective Assistance of Counsel

¶ 80    The defendant next argues that he was denied effective assistance of counsel where counsel failed to request that his unsuccessful attempts to invoke his right to remain silent be redacted from the interrogation video shown to the jury.

¶ 81    Our review of ineffective assistance of counsel claims is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, one must show both that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong) and (2) a reasonable probability exists that, but for the error, the result would have been different (prejudice prong). *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011). A defendant must satisfy both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Thus, defendant's failure to establish either deficient performance or prejudice will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

---

[4]Because we conclude that the trial court did not err by denying the defendant's motion to suppress, we need not discuss the issue of harmless error. See *People v. White*, 2011 IL 109689, ¶ 144 (we need not consider issues that are not essential to the disposition of the case).

28

¶ 82    To establish deficiency under the first prong of the *Strickland* test, "defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). The reviewing court must evaluate counsel's performance from her perspective at the time rather than "through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). An evaluation of counsel's actions cannot extend into matters involving the exercise of judgment, strategy, or trial tactics. *People v. Penrod*, 316 Ill. App. 3d 713, 722 (2000). "Reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable." *Manning*, 241 Ill. 2d at 335.

¶ 83    In this case, defense counsel requested, prior to trial, that the defendant's statements in which he unsuccessfully attempted to invoke his right to remain silent not be redacted from the interrogation video shown to the jury. Counsel specifically requested, "As part of the flow of the conversation, we would ask that those be left in when he wants to stop the conversation and it doesn't stop." However, counsel requested that the State not be allowed to argue that the defendant's statements allegedly invoking his right to silence were evidence of guilt. Counsel subsequently requested redaction of the portions of the video when the officers left the room for a while pursuant to the defendant actually invoking his right and when the officers told the defendant they could not talk to him because of his assertion. The trial court granted defense counsel's request, and so the jury saw the defendant's statements indicating he wanted to go home, he had nothing else to say, he was "through with it," and he wanted to call his "people." However, the defendant's statements that he did not wish to talk any more were not

29

shown to the jury. Based on the foregoing, the defendant's argument that defense counsel's decision constituted ineffective assistance fails as the record reveals it was clearly made as a part of counsel's trial strategy. The fact that her strategy was ultimately unsuccessful does not render counsel's performance deficient.

¶ 84                                    C. Sentencing

¶ 85     The third and fourth issues raised by the defendant on appeal both relate to his sentence. Initially, the defendant argues that the trial court considered four improper factors in aggravation. The defendant also maintains his *de facto* life sentence is excessive where the court failed to give adequate weight to his potential for rehabilitation as evidenced by certain mitigating factors. Because he failed to preserve these claims of error in a motion to reconsider sentence, they are considered forfeited unless we deem them to be plain error. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 11.

¶ 86     The plain-error doctrine allows a reviewing court to consider an unpreserved sentencing error when a clear or obvious error occurred and the evidence at the sentencing hearing was closely balanced or that error was so egregious as to deny a defendant a fair sentencing hearing. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Under either prong of the plain-error analysis, the burden of persuasion remains with defendant. *People v. Wilmington*, 2013 IL 112938, ¶ 43. However, the first step in plain-error review is to determine whether any error has been committed at all. *People v. Johnson*, 347 Ill. App. 3d 570, 574 (2004). If error did occur, then this court considers whether either of the two prongs has been satisfied. See *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 87    The defendant was convicted of first-degree murder with a sentencing range of 20 to 60 years' imprisonment, and based on the jury's finding that he personally discharged a firearm proximately causing death, he was eligible for an extended term sentence of between 45 and 85 years' imprisonment. He was sentenced to 60 years' imprisonment followed by 3 years of MSR, which was within the extended term sentencing range. He is arguing second-prong plain error in that his substantial right to be lawfully sentenced was violated.

¶ 88    It is well settled that a trial court is given broad discretion in fashioning a sentence. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). When a sentence falls within the statutory sentencing range for an offense, it may not be disturbed absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). A court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable to the extent that no reasonable person would agree with it. *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 32. The court is given such deference because it is in a better position to consider, among other things, defendant's credibility, mentality, demeanor, general moral character, age, habits, and social environment. *Id*. A proper sentence balances the seriousness of the offense with the objective of restoring a defendant's rehabilitative potential. Ill. Const. 1970, art. I, § 11.

¶ 89    The Unified Code of Corrections permits the trial court to consider certain statutory factors in aggravation and mitigation when imposing a sentence of imprisonment. 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2012). In fashioning the appropriate sentence, the court must carefully weigh all of the factors in mitigation and aggravation,

31

which include defendant's age, demeanor, habits, credibility, criminal history, social environment, and education as well as the nature and circumstances of the crime and of defendant's conduct in the commission of the crime. *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010). When such factors have been presented for the court's consideration, it is presumed, absent some contrary indication, that the factors have been considered. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). A court has considerable latitude in sentencing a defendant, as long as it neither ignores relevant mitigating factors nor considers improper aggravating factors. *Id*. at 157. When reviewing a court's sentencing decision, the reviewing court should not focus on a few words or statements made by the court. *People v. Ward*, 113 Ill. 2d 516, 526 (1986). Instead, the determination of whether the sentence was improper must be made by considering the record as a whole. *Id.* at 526-27. The decision of whether the court relied on an improper factor in sentencing a defendant ultimately presents a question of law we review *de novo*. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 90 The defendant's first claim of error with respect to his sentence is that the trial court improperly considered two factors that are inherent in the offense itself. Although the court exercises broad discretion in imposing a sentence, it is not allowed to consider a factor implicit in the offense as a factor in aggravation. *Id*. ¶ 9. "[A] single factor cannot be used both as an element of an offense and as a basis for imposing a 'harsher sentence than might otherwise have been imposed.' " *Id*. (quoting *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992)). However, this rule is not to be strictly applied, as public policy requires that a sentence shall be determined in accordance with the circumstances of the

particular offense. *People v. Thomas*, 171 Ill. 2d 207, 226-27 (1996); *People v. Cain*, 221 Ill. App. 3d 574, 575 (1991). Thus, the court may properly consider the degree of harm, force employed, and the physical manner in which the victim's death was caused in aggravation, even if such factors are arguably inherent in the offense. *Thomas*, 171 Ill. 2d at 227; *People v. Joe*, 207 Ill. App. 3d 1079, 1086 (1991); *Cain*, 221 Ill. App. 3d at 575. A defendant bears the burden of proving the court relied on an improper factor in imposing his sentence. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9.

¶ 91    In this case, the defendant maintains the trial court erred in considering two factors inherent in the offense of murder: (1) that his conduct caused or threatened serious harm and (2) that he acted intentionally. However, we find it is clear from the court's statements, when read in context of the record as a whole, that the court was not considering either the victim's death or the defendant's intent as a single factor in aggravation. Instead, the court was considering the force employed by the defendant, the degree of harm inflicted, and the manner in which the victim's death was caused. The court's statements were consistent with the State's argument relating to these factors in that, "A man who shoots a friend nine to ten times and leaves him bleeding on the side of the road like an animal is a man who needs to be incapacitated from the community[.]" Although the court did not fully explain its rationale until later in its pronouncement, we find its remarks that it took into account the facts and circumstances of this case, including the fact that the victim's murder was particularly brutal due to the number of gunshot wounds inflicted, could be described as an "execution," and "certainly wasn't an

33

accident," all confirm that the court was not relying on the elements of the offense as aggravating factors in deciding his sentence.

¶ 92    As recently explained by the First District:

> "A trial court is not required to refrain from any mention of sentencing factors that constitute elements of the offense. [Citation.] Sentencing hearings do not occur in a vacuum, and the duty to impose a fair sentence entails an explanation of the court's reasoning in the context of the offenses of which a defendant has been convicted. A fair sentence is not just the product of mechanically tallying factors in aggravation and mitigation and calculating the result. Indeed, a sentencing hearing is likely the only opportunity a court has to communicate its views regarding the defendant's conduct, and thus we do not agree that a trial judge's commentary on the nature and circumstances of a defendant's crimes necessarily results in improperly using elements of the offense as factors in aggravation." *Sauseda*, 2016 IL App (1st) 140134, ¶ 15.

We agree with the foregoing reasoning, and thus, we find the defendant has failed to satisfy his burden of proving the court improperly relied on factors inherent in the offense of murder in rendering his sentence.

¶ 93    The defendant also asserts the trial court improperly considered two factors that were beyond the defendant's control and based on the court's own personal knowledge and history. The defendant specifically points to the court's remarks about crime being a "plague" in the Washington Park community. He also contends the court's references to having suffered the loss of a significant person in his life were erroneous. In determining an appropriate sentence, the court is not allowed to rely on information gained through its own personal investigation, and the court should not determine a defendant's sentence based its own personal knowledge, prejudice, speculation, or conjecture. *People v. Cervantes*, 2014 IL App (3d) 120745, ¶¶ 43, 47; *People v. Dempsey*, 242 Ill. App. 3d 568, 597 (1993). This is because "[a] reasoned judgment as to a proper sentence must be

34

based upon the particular facts and circumstances of each individual case." *People v. Henry*, 254 Ill. App. 3d 899, 905 (1993).

¶ 94 In this case, however, the trial court never indicated it was considering these factors in aggravation of the defendant's sentence. In contrast, the court made a statement directly to the families affected by the victim's murder in an attempt to explain that the length of the defendant's sentence would likely not decrease the pain they were suffering and then explicitly stated it was rendering a sentence based on the facts and circumstances of this case. Even assuming *arguendo* that the court erred in making such statements, to require remand for resentencing, a defendant is required to show more than the mere mention of an improper fact. *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007). Isolated statements made in passing, even if improper, do not require remand for resentencing unless defendant proves the court relied on the improper facts in imposing his sentence. *Id*. In the present case, the defendant has failed to so establish as the comments at issue do not show that the court placed significant weight on the allegedly improper factors in determining his sentence. Therefore, the defendant has failed to establish that the court relied on improper factors beyond his control or based on the court's own personal knowledge and history in sentencing him. In light of our finding that the court did not consider any improper factors in sentencing the defendant, he cannot establish that he was prejudiced by defense counsel's failure to preserve claims of error relating to these issues, and his argument that counsel was ineffective for this reason is without merit.

¶ 95    Finally, the defendant asserts that his *de facto* life sentence is excessive where the trial court failed to give adequate weight to his potential for rehabilitation as evidenced by certain mitigating factors. We disagree.

¶ 96    Because the defendant's 60-year sentence was within the applicable sentencing range, it is presumptively valid. See *Sauseda*, 2016 IL App (1st) 140134, ¶ 12 (similarly finding). We also presume that the trial court considered the mitigating evidence presented to it, absent evidence to the contrary. *Flores*, 404 Ill. App. 3d at 158. "The existence of mitigating factors does not mandate imposition of the minimum sentence [citation] or preclude imposition of the maximum sentence [citation]." *Id*. Further, a reviewing court is not permitted to reweigh the aggravating and mitigating factors considered by the sentencing court. *Id*.

¶ 97    With respect to the defendant's specific argument, we note that a defendant's rehabilitative potential is only one of the factors that should be considered by the trial court in sentencing a defendant. *Id*. at 159. The most important factor in sentencing, however, is the seriousness of the offense. *Id*. In rendering its sentence, the court is not required to explicitly outline its reasons for finding that defendant lacked rehabilitative potential. *Id*. "[T]he nature and circumstances of the offense and the history and character of the defendant will be the governing factors of rehabilitative potential." (Internal quotation marks omitted.) *Id*.

¶ 98    Upon reviewing the entire record of the defendant's sentencing hearing, it is clear the trial court weighed the appropriate aggravating and mitigating factors and decided an appropriate sentence in light of the seriousness of the offense. See *Abrams*, 2015 IL App

(1st) 133746, ¶ 34 (the seriousness of the offense may outweigh the goal of rehabilitating defendant). Nevertheless, the defendant contends his sentence is excessive as (1) "he had a relatively minor criminal history"; (2) he had a history of employment, although he was not "formally employed" at the time of the events giving rise to this case; (3) he attended school through the eighth grade and wanted to obtain his General Education Diploma; and (4) he had strong family ties, his family was having difficulty supporting his children, and his children would be 66 to 67 years old by the time he was released from prison. However, the record reflects the defendant's brother touched on a couple of these issues during his testimony at the sentencing hearing, defense counsel raised some of them in her argument at sentencing, and the matters were discussed in the presentence investigation report. Therefore, there is no evidence in the record to rebut the presumption that the court considered these factors. See *Sauseda*, 2016 IL App (1st) 140134, ¶ 20 (similarly finding). As such, we presume the court considered them in fashioning the appropriate sentence for the defendant. See *id*.; see also *Flores*, 404 Ill. App. 3d at 158.

¶ 99                                    III. CONCLUSION

¶ 100  For the foregoing reasons, the judgment of the circuit court of St. Clair County is hereby affirmed.


¶ 101  Affirmed.