2023 IL App (1st) 210987-U

THIRD DIVISION
June 7, 2023

No. 1-21-0987

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Circuit Court of |
| | ) Cook County. |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) No. 14 CR 11351 |
| | ) |
| TYNEIL WASHINGTON, | ) |
| | ) Honorable Diana L. Kenworthy, |
| Defendant-Appellant. | ) Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice McBride and Justice Burke concurred in the judgment.

**ORDER**

¶ 1     *Held:* The trial court's error in denying defendant's motion to suppress his statements based upon his purported invocation of his right to remain silent was harmless beyond a reasonable doubt. Defendant's trial counsel did not render ineffective assistance for failure to modify a pattern jury instruction. Affirmed.

¶ 2     Following a jury trial, defendant Tyneil Washington was convicted of first-degree murder and sentenced to 48 years' imprisonment. On appeal, defendant contends that (1) the trial court erroneously denied his motion to suppress his inculpatory statements based upon his invocation of his right to remain silent, and (2) his trial counsel rendered ineffective assistance for failure to modify a pattern jury instruction. We affirm.

¶ 3                                    BACKGROUND

¶ 4     The State charged defendant with multiple counts of first-degree murder, armed robbery, and aggravated unlawful restraint in connection with the shooting death of Herbert Goode. The State later nol-prossed all but three counts of first-degree murder and one count of armed robbery.

¶ 5                     Defendant's Motion to Suppress Statements

¶ 6     Before trial, defendant moved to suppress certain statements that he made to the police. Among other things, defendant claimed that, during his interrogation at around 5:21 p.m. on May 29, 2014, he invoked his right to remain silent, but police continued to interrogate him. Defendant stated that, at around 8:24 p.m. on that same date, he asked to call his mother so that she could hire an attorney to represent him during the interrogation, but police also denied his request. Defendant added then, when his attorney arrived at the police station, the attorney was not brought to see him prior to the end of the interrogation. Defendant concluded that, under the totality of the circumstances, his statements were involuntarily made and in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966). Defendant asked the court to suppress his inculpatory statements.

¶ 7     At the hearing on his motion to suppress, the trial court granted the State's request to admit and publish three exhibits (State's exhibits 1A, 1B, and 1C) comprising the videorecording of defendant's interview with the police. The following evidence was then presented at the hearing.

¶ 8     Chicago police detective Timothy Cerven testified that he and his partner, Detective Dale Potter, interviewed defendant on May 29, 2014, and that the interview had been videorecorded. Cerven stated that he was present at around 11:23 a.m. on that day when Potter read defendant his *Miranda* rights. Defendant indicated that he understood those rights. Cerven acknowledged that State's exhibit 1B was a true and accurate video recording of part of his and Potter's interview of defendant. The State then played portions of the video recording.

¶ 9 State's exhibit 1B reveals the following. At approximately 5:19 p.m., defendant denied any knowledge about the shooting and asked if he could go "to the county [jail] or something." In response, Detective Potter told defendant he would go "as soon as we're done, but we're not done yet." At around 5:20 p.m., defendant was asked about "what happened" in Champaign, Illinois. Defendant responded, "I don't know." Potter laughs, and then the following exchanges occurred at around 5:21 p.m.:

> "Defendant: Man, look. I don't got sh** to—more to say.
>
> I don't got no more to say, man.
>
> Cerven: You got no more to say.
>
> Defendant: I'm tired of keep saying I don't know.
>
> Potter: I know because you say it all the time.
>
> Defendant: Yeah.
>
> [*crosstalk between Potter and defendant*]
>
> Cerven: So what are you saying, you don't want to talk to
>
> us anymore?
>
> Defendant: No, no.
>
> Cerven: You don't want to say anything?
>
> Defendant: I don't know what to tell you."

Cerven then states, "All right. We just figured we'd offer up what we have left, so besides the witnesses and the people you talked to. And the sketch."

¶ 10 At that point (just before 5:22 p.m.), Potter asks defendant to tell them about "the conversation you had with old girl," *i.e.*, defendant's girlfriend in Champaign. Following brief crosstalk between defendant and the detectives, the following colloquy took place:

"Defendant:  Man, look.  Look, man, I'm going to tell you what the f*** I been telling you:  I don't know.

Potter:  Well, 'you don't know' and 'I don't know' don't f***ing work because you're sitting in a f***ing box right now, facing murder charges for some old man that don't deserve to be dead because you had an itch for some money.  So here you sit.  So 'I don't know' doesn't f***ing work.  Do you understand me?

Defendant:  Do you understand me?

Potter:  No, I don't.

Defendant:  Well, I don't understand you.

Potter:  You—  The only thing that I can figure is that you're a man who doesn't really give a f***.  You're sitting there in a corner, you say, 'F*** it.  I don't care.  Bring it.'  That's what you're telling me.  You're telling me to bring whatever I've got and whatever happens to me, happens to me.  And you don't give a f***.  Is that true?

Defendant:  Man, you don't know what the f***'s up.

Potter:  I do know what the f***'s up."

Potter then explained that defendant had been identified as the shooter and that the detectives had gathered "a lot" of evidence establishing defendant's guilt.

¶ 11    Defendant said that he didn't know why the officers "kept coming back here."  Cerven responded that, after having "a chance to think about what happened" and what the officers had told defendant, they thought defendant would want to "talk about it."  Cerven informed defendant

4

that they had told him what they had and added, "It ain't getting any better for you." Cerven then asked defendant, "So, are we done?" Defendant replied, "Uh-huh," and Cerven stated that the detectives would likely place defendant in the lockup. Cerven and Potter then left the room.

¶ 12    At around 8:05 p.m., Detective Tom Vovos spoke to defendant and began by summarizing the evidence implicating defendant. At various points during the interview with Vovos, defendant asked whether he could receive a 25-year sentence in exchange for his statement, but Vovos responded that he could not guarantee the sentence that he would receive. At approximately 8:30 p.m., defendant said, "Okay, let's get this sh** over with." Defendant generally described the shooting as a "robbery gone bad," explaining that the victim grabbed defendant's arm, "and then the f***ing gun went off." Defendant subsequently made additional inculpatory statements.

¶ 13    Defendant testified on his own behalf at the hearing on his motion to suppress. Defendant stated that he intended to assert his right to remain silent, but the interrogation continued, and he did not believe he could stop the interrogation. Defendant asked to call his mother so that she could call an attorney, because defendant did not know that he could have an attorney appointed to represent him at no cost. Defendant added that he did not know that anything he said was going to be used against him. Defendant believed he was "helping [himself] out of the situation." Defendant said that he felt fearful and feared for his life because of the foul language and "yelling" on the part of police officers. On cross-examination, however, defendant agreed that he had been in custody in the police station "plenty of times" but never in an interrogation room. Defendant, however, conceded that he had heard the *Miranda* warnings in the other times that he had been in custody. Defendant stated that his prior warning had been "years before," but he admitted that he had been arrested in February 2014, three months prior to his interrogation. When the State asked whether he had also been arrested in December 2013, defendant said he did not remember.

5

¶ 14   In rebuttal, the State noted that defendant had three felony convictions in the previous ten years.  The parties then presented their arguments.

¶ 15   At the conclusion of the hearing, the trial court announced its findings.  The court stated that it had reviewed the video recording of the interviews, and it stated, "[W]hat I saw was assertiveness and manipulation executed both by the defendant and the police."  The court found that defendant was "endeavoring to garner some empathy, perhaps," on the part of the police.  The court also recounted that defendant "introduced the 25 years [imprisonment in exchange for a guilty plea]" into the discussion, which the court believed was defendant "beginning a series of negotiations with an eye towards perhaps an outcome that he's seeking to achieve."  The court added that it also observed defendant during his testimony and while in court generally.

¶ 16   The court added that, although defendant at some point stated "something that's in the nature of 'I'm done talking' or something like that," the court nonetheless found that defendant's statement was an "incomplete" invocation of his right to remain silent.  The court further observed that defendant had not "completely abated" the interview, which the court characterized as "ongoing and mutual" between defendant and the police.  The court again reiterated, "I'll also indicate that I didn't hear a full invocation of his right to remain silent."  The cause subsequently proceeded to trial, at which the following evidence was adduced.

¶ 17                                  Defendant's Trial

¶ 18   Juan Ugalde testified that, on the day of the shooting, he worked in the warehouse at 2301 West 57th Street in Chicago, which the victim owned.  At around 2 p.m. that day, Ugalde briefly spoke with the victim inside the warehouse.  The victim then left the warehouse, and shortly thereafter, Ugalde also went outside.

¶ 19   Once outside, Ugalde looked across the street and saw the victim open the driver's side door of a red Volkswagen minivan, which Ugalde identified in the State's exhibit number 23 as the victim's vehicle.[1]  The victim then began "fighting" with another man.  According to Ugalde, he was about 15 feet away, standing near the front "right side" of his TrailBlazer (between the vehicle and the building).  Ugalde said the other man, who was black, was not "actually fighting"; rather, the victim was pushing the other man away.  Ugalde identified defendant in court as the man that the victim was pushing.  Ugalde added that defendant was holding a gun and pointing it at the victim's chest.  Ugalde said the gun was "dark and shiny on top."  Ugalde said that, as the victim and defendant were struggling, Ugalde heard a shot and then ran back inside the building.  Ugalde then heard a second shot.  Ugalde stayed inside for several minutes, and when he went back outside, he saw the victim lying on the ground.

¶ 20   Ugalde said that defendant was wearing a dark colored "hood jacket with a hoodie" and that, although the hood was up, he could still see defendant's face.  Ugalde further stated that defendant's skin was a "[l]ight dark [*sic*] color" and that defendant was about six feet tall.  Ugalde said that, prior to the shooting, he had never seen defendant before.

¶ 21   About a month later, Ugalde said that he saw defendant walk by on 57th Street.  Ugalde recalled that defendant was not wearing a jacket, and Ugalde could see a tattoo of a ribbon on defendant's neck with the letters "P-A-M."  Ugalde added that he subsequently identified defendant in a photo array and in a physical lineup as the shooter.

¶ 22   Ugalde further conceded that, in September 2014, he spoke to Detective Potter regarding Ugalde's application for a "U visa," which Ugalde agreed was "a specific visa that might apply to

---

[1]   We further note that this photographic exhibit, which was included in the record on appeal, shows a somewhat lengthy cluster of trees along the northern border of the property.

victims of crime."[2] Ugalde confirmed that a U visa had been filled out on his behalf and submitted listing him as a witness in this case, but Ugalde further confirmed that his application for a U visa was denied. Ugalde added that a second U visa application that he filled out in 2018 was also denied.

¶ 23 On cross-examination, Ugalde agreed that, to see the struggle and eventual shooting between defendant and the victim, Ugalde had to look through three car windows: his Trailblazer's passenger-side window, his Trailblazer's driver-side window, and the passenger-side window of the victim's minivan. Ugalde further agreed that the experience was "very stressful" and "frightening," and that he was focusing on the gun once he saw it. Ugalde also conceded that he had told Chicago police detective Guerrero that he had seen defendant "on previous occasions walking past" the building. Ugalde also admitted that he did not initially go to the police; instead, he only went to the police after speaking to a friend who told him, " 'Do the right thing.' " Ugalde reiterated that Detective Potter helped fill out paper forms so that Ugalde could obtain a U visa.

¶ 24 Defense counsel then asked, "And when the police called you, they said they have the guy who attacked and killed Herbie, right?" Ugalde responded, "They didn't say that." Defense counsel then asked again whether the police told Ugalde that they had the person "who murdered Herbert Goode?" The State, however, lodged an objection in the middle of counsel's question, and Ugalde responded, "I can't remember. They called me—," at which point the trial court directed Ugalde to wait until the objection was ruled upon. The trial court then sustained the State's objection. On redirect examination, Ugalde confirmed that, at the time of the shooting, he

---

[2] See generally, "Victims of Criminal Activity: U Nonimmigrant Status," U.S. Citizenship and Immigration Services, https://www.uscis.gov/humanitarian/victims-of-human-trafficking-and-other-crimes/victims-of-criminal-activity-u-nonimmigrant-status (last visited April 13, 2023).

saw the face of the shooter, whom he had identified in court as defendant. The parties subsequently stipulated that Ugalde had told defense counsel and a defense investigator that, when Ugalde was asked to view a police lineup, the police had told Ugalde that they "had the guy who murdered Herbert Goode."

¶ 25    The parties further stipulated that (1) two spent cartridges found at the scene were fired from the same 9 mm weapon, and (2) no fingerprints suitable for comparison were found on the discharged cartridge case recovered at the scene.

¶ 26    Henri Espinoza testified that he owned an automotive repair shop in the victim's building, and at around 2 p.m. on March 1, 2014, the victim came to his shop and collected $840 in rent. Espinoza stated that, a "little bit after," he heard others say that someone was shooting, so he locked the door to his shop. He waited about two or three minutes and then went outside, where he saw the victim lying on the ground unconscious. He called 9-1-1, and on their instructions, tore open the victim's shirt and saw "two holes on [*sic*] his chest."

¶ 27    Miguel Espinoza testified that, at around 2 p.m. on the day of the shooting, he drove with his mother, Dolores Alvarado, to a mechanic shop where his brother worked that was located inside the victim's building. Miguel parked behind a red TrailBlazer, and as he walked toward the building, he saw his nephew, whom he said was either seven or eight years old, walking toward him. His mother remained in the car. At that point, he heard a gunshot and turned to see where it was coming from. Although he saw two people struggling next to a red minivan, Espinoza did not see their faces. He then grabbed his nephew and ran into the shop. Espinoza said his mother followed him into the building.

¶ 28    Alvarado testified that, on the day of the shooting, she went with her son, Espinoza, to see her other son at his shop. They parked the car, and Espinoza got out while she stayed in the front

passenger seat. She then saw a man leave the building where her other son's shop was, walk across the street to a red "wagon," and begin struggling with another man. She said that this other man was carrying a black gun and wearing a black sweater with a "hoodie." She then heard a gunshot, followed by another. After she heard the gunshots, she followed Espinoza into the building. She could not recall what either man looked like.

¶ 29 Tamara Chandler testified that, in April 2014, she was defendant's girlfriend and lived in Champaign, while defendant lived in Chicago. Around that time, defendant was visiting her, and while they were watching a television show about "investigators solving a crime," defendant commented that the person on television "was stupid because they got caught." Chandler said that defendant then retrieved from his phone a "news clipping" video about an "older white man" being robbed and murdered. Chandler recalled that defendant said that he was "hiding in the bushes[,] and *** when the man came out[,] he shot him." Chandler added that defendant stated that he planned on robbing the man. On May 19, 2014, Chandler met with a Chicago police officer in Champaign, where she identified defendant in a photo array.

¶ 30 On cross-examination, Chandler conceded that, although defendant admitted committing a murder in April, she did not contact the police until May 16, 2014. Chandler also agreed that, despite his admission, she continued to allow him to stay in her home, which she shared with her children. Chandler further conceded that she told defense counsel and a defense investigator that (1) she had "no recollection of any conversation" with defendant, (2) she was under psychiatric care for memory problems and anxiety, and (3) her medication has "[m]essed [her] memory up." Chandler also acknowledged that she was provided with a hotel stay as well as transportation from Champaign to Chicago and the court.

¶ 31    On redirect examination, Chandler explained that she did not say anything to police prior to May because she was scared. She further explained that she did not have a car and was unable to transport herself from Champaign to Chicago. Finally, Chandler stated that her memory as to her conversation with defendant was "good," adding, "I couldn't forget something like that."

¶ 32    Detective Cerven testified that, on May 20, 2014, he administered a photo array to Ugalde. Cerven stated that Ugalde identified defendant from the array as the shooter. On cross-examination, Cerven agreed that his supplemental report indicated that defendant was 5′9″ tall and weighed 175 pounds. On redirect examination, Cerven stated that defendant was placed in an interview room in the police station at around 11 a.m. on May 29, 2014. Cerven and his partner, Detective Potter, first spoke to defendant at around 11:20 a.m. for about 15 minutes. The detectives then left defendant in the room and returned at around 3:15 p.m. and spoke to defendant again for about 20 minutes before leaving for a second time, and finally they returned to speak to defendant at around 5:15 p.m. for approximately 6 or 7 minutes.

¶ 33    Chicago police detective Tom Vovos testified that, at around 8 p.m. on May 29, 2014, he spoke with defendant at the police station. Vovos stated that his interview of defendant was video recorded, and he testified to the authenticity of certain video "clips" of his interview with defendant that were played for the jury. In the video recording, defendant explained to Vovos that the shooting resulted from a "robbery gone bad." Defendant explained, "I was trying to rob [the victim], and he wouldn't give it up." Defendant stated that the victim grabbed his arm, and then the gun went off. After the shooting, defendant fled the area initially on foot, and he told Vovos that he sold the gun on "another day." Defendant stated that, since the shooting, he had been staying either in Chicago or with his girlfriend in Champaign.

¶ 34    On cross-examination, Detective Vovos admitted that a clip played for the jury indicated that Vovos told defendant that denying that he had committed the crime would not help him. The

video recorded interview included in the record on appeal indicates that Vovos told defendant, "You have an opportunity *** to basically explain anything that may have happened that day. Okay? If you choose to not say anything, I mean, that's going to kind of look bad on you." Vovos further admitted that, although he explained to defendant that this was "his opportunity," it was in fact "[Vovos'] opportunity to gather evidence" against defendant.

¶ 35     At the conclusion of Vovos' testimony, the State rested. The court subsequently held a jury instructions conference, where the State proposed the unmodified version of Illinois Pattern Jury Instructions (IPI), Criminal, No. 3.15 (approved July 28, 2017), (hereinafter IPI Criminal No. 3.15). Defense counsel indicated "[n]o objection" to that instruction.

¶ 36     Defendant then called Dr. Geoffrey Loftus to testify as an expert in "human perception[,] memory[,] and experimental psychology." Dr. Loftus explained that, although any memory begins with an event, "post-event" and "pre-event" information (*i.e.*, information that is not perceived but is nonetheless incorporated into the memory) can affect the memory of that event. Notably, Dr. Loftus testified that, post-event information is not necessarily "wrong"; it is simply "dubi[o]us." Dr. Loftus agreed that, when there is a weapon present during an event, "people tend to pay attention to it," which may result in their attention being diverted from "other aspects of the event such as the appearance of the person who is holding the weapon." Dr. Loftus added that, when viewing something (such as a person) through a pane of glass, "the visual information can become degraded." In addition, according to Dr. Loftus, a person's "mental functioning of all sorts is diminished," including the ability to "memorize the appearance of people who[m] they are interacting with," when placed in a highly stressful situation. Dr. Loftus added that the belief that, although people may have memories that are very detailed and "real seeming" after a highly

stressful situation, their confidence in the memory does not "in any way corroborate with the actual accuracy of the memory."

¶ 37    On cross-examination, Dr. Loftus admitted that he was unaware of the lighting conditions at the time of the shooting, other than the fact that it occurred "during the day."  Dr. Loftus further conceded that he did not go to the scene and did not interview Ugalde.  Finally, Dr. Loftus agreed that none of the various experiments in memory that he conducted involved someone being shot.

¶ 38    Following closing arguments, the trial court instructed the jury in relevant part as follows:

> "You should consider all the evidence in the light of your own observations and experiences in life.  Neither by these instructions nor by any ruling or remark which I have made to you do I mean to indicate any opinion as to the facts or as to what your verdict should be.
>
> * * *
>
> *** Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence.  Neither opening statements nor closing arguments are evidence.  And any statement or argument made by the attorneys, which is not based on the evidence, should be disregarded.
>
> * * *
>
> When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence included but not limited to the following:  The opportunity the

witness had to view the offender at the time of the offense, the witness's degree of attention at the time of the offense, the witness's earlier description of the offender, the level of certainty shown by the witness when confronting the defendant, the length of time between the offense and the identification confrontation."

At the conclusion of jury instructions, the jury retired to deliberate. The jury also received a copy of the jury instructions, including IPI Criminal No. 3.15.

¶ 39     The jury subsequently found defendant guilty of first-degree murder but not guilty of armed robbery. The jury further found that defendant personally discharged a firearm that proximately caused death to another person. Following a sentencing hearing, the trial court sentenced defendant to an aggregate term of 48 years' imprisonment, consisting of a 23-year sentence for the murder conviction and a 25-year mandatory sentencing enhancement based upon the jury's finding that defendant committed the murder while armed with a firearm. This appeal follows.

¶ 40                                                      ANALYSIS

¶ 41                          The Denial of Defendant's Motion to Suppress

¶ 42     On appeal, defendant first contends that the trial court erroneously denied his motion to suppress his statement. Defendant argues that he "unambiguously" invoked his right to remain silent, but police officers "would not honor his invocation and instead set about to undermine that invocation" until defendant agreed with their accusations. According to defendant, these statements "established parts of the State's case it did not otherwise have," and therefore this court should reverse his convictions and remand this cause for a new trial.

¶ 43     The United States and Illinois Constitutions provide that no person shall be compelled in any criminal case to be a witness against himself. See U.S. Const., amend. V; Ill. Const. 1970, art.

I, § 10. Once a suspect indicates "in any manner" prior to or during police questioning that he wishes to remain silent, the interrogation must cease. *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966). This right must be "scrupulously honored." *Id.* at 479.

¶ 44 Nonetheless, a suspect's invocation of the right to remain silent must be "unambiguous, unequivocal, and clear." *People v. Kronenberger*, 2014 IL App (1st) 110231, ¶ 33 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)). The right to remain silent may be invoked verbally or through conduct that clearly indicates a desire to end all questioning. *People v. Diaz*, 377 Ill. App. 3d 339, 347 (2007). If verbal, the demand to end the interrogation must be "specific." *Id.*

¶ 45 We review a trial court's ruling on a motion to suppress under a two-part standard: we must uphold the court's factual findings unless they are against the manifest weight of the evidence, but we review *de novo* its ultimate ruling on whether suppression is warranted. *In re D.L.H., Jr.*, 2015 IL 117341, ¶ 46 (citing *People v. Colyar*, 2013 IL 111835, ¶ 24). Factual findings are deemed to be against the manifest weight of the evidence " 'only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence.' " *People v. Jones*, 2014 IL App (1st) 120927, ¶ 50 (quoting *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002)). Moreover, in reviewing the trial court's decision on a motion to suppress, we may consider the testimony adduced at trial as well as at the suppression hearing. *People v. Slater*, 228 Ill. 2d 137, 149 (2008).

¶ 46 In this case, the video recorded interview shows that Detective Potter advised defendant of his *Miranda* rights at around 11:23 a.m. on May 29, 2014. Defendant indicated that he understood those rights. Detective Potter and his partner, Detective Cerven, then left. At about 5:19 p.m., defendant was asked whether he recalled his earlier *Miranda* warnings, and defendant indicated he did recall them. The detectives left again, and returned shortly after. At that point, defendant

was asked about what happened in Champaign, to which defendant responds, "I don't know." Detective Potter laughs at and ridicules defendant's repeated response of "I don't know." Defendant comments that he is "tired of" saying "I don't know." After some brief crosstalk amongst the three parties, Cerven asks defendant, "So what are you saying, you don't want to talk to us anymore?" Defendant responds, "No, no," and when Cerven again asks whether defendant no longer wants to talk to them, defendant answers, "I don't know what to tell you."

¶ 47    Based upon our careful and repeated review of this portion of the videotaped interrogation, we hold that defendant made an "unambiguous, unequivocal, and clear" invocation of his right to remain silent. See *Kronenberger*, 2014 IL App (1st) 110231, ¶ 33. Shortly after the detectives returned to begin interviewing defendant at around 5:19 p.m., defendant denied any knowledge of the shooting and asked to go to the county jail. Detective Potter, however, disregarded defendant's refusal to answer questions and told defendant that he would go to the county jail when *they* were finished interviewing him, but Potter added, "[W]e're not done yet." Soon after, defendant again told detectives that he had "no more to say," but the detectives continued their questioning. Defendant also responded, "No, no" to Cerven's subsequent question whether defendant wanted to continue to talk to them. Detectives, however, ignored this third request and continued their interrogation. Only after a somewhat lengthy back-and-forth (including shouted obscenities)— when defendant for a fourth time replied, "Uh-huh" to Cerven's question, "Are we done?"—did the detectives acquiesce in defendant's request. In the factual context of this case, it appears that defendant's statements indicated a clear desire to stop all questioning, but the officers failed to scrupulously honor his request. Although the trial court found that defendant did not make a "full invocation" of his right to remain silent, that finding was against the manifest weight of the

16

evidence because the facts here indicate that the opposite conclusion is apparent. See *Jones*, 2014 IL App (1st) 120927, ¶ 50. Therefore, the trial court erroneously denied defendant's motion.

¶ 48    Nonetheless, as the State points out, although the improper admission of an unlawfully obtained confession "rarely" is harmless error, our supreme court has held that such an error may be harmless under certain circumstances. See *People v. Salamon*, 2022 IL 125722, ¶ 122 (citing *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988); *People v. Mitchell*, 152 Ill. 2d 274, 327-28 (1992)). Those circumstances are present here.

¶ 49    Among the approaches courts have relied upon to determine whether an error is harmless is whether "the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *Id.* Here, the evidence supporting defendant's guilt was overwhelming. In brief summary, the evidence included the testimony of (1) Chandler, who lived in Champaign but recounted to police defendant's confession to her that he shot and killed an older white man in Chicago; (2) Ugalde, who was an eyewitness to the shooting and unhesitatingly identified defendant in court, in a physical lineup, and in a photo array as the shooter; and (3) other witnesses whose testimony corroborated the charged offenses. Since defendant's confession was cumulative of the other evidence produced at trial, any error in the admission of the video recorded confession was harmless. See *id.* Therefore, defendant's claim of error on this point is unavailing.

¶ 50                    Defendant's Ineffective Assistance Claim

¶ 51    Defendant next contends that his trial counsel rendered ineffective assistance when he failed to modify a pattern jury instruction to reflect the testimony of his expert witness, Dr. Loftus. Specifically, defendant argues that the existing pattern instruction is "inadequate and outdated," and it does not reflect "scientific principles relevant to assessing human perception and memory." Defendant then argues that his defense theory "required" trial counsel to modify the pattern

17

instruction, and if a modified instruction had been given to the jury, a "not guilty verdict would have been reasonable in light of the evidence." Defendant thus asks that we grant him a new trial.

¶ 52    Both the federal and state constitutions guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To establish ineffective assistance of counsel, a defendant must show both a deficiency in counsel's performance and prejudice resulting from that deficiency. *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 129 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland*)). In other words, pursuant to *Strickland*, a defendant must show the following to prevail on a claim of ineffective assistance: (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance so prejudiced the defense as to deny the defendant a fair trial. *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008) (citing *Strickland*, 466 U.S. at 687).

¶ 53    To meet the first prong of objectively unreasonable performance, a defendant must overcome the "strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence." *People v. Coleman*, 183 Ill. 2d 366, 397 (1998)). "*Strickland*'s first prong sets a high bar." *Buck v. Davis*, 580 U.S. 100, 118 (2017). Notably, ineffective assistance of counsel refers to "competent, not perfect," representation. *People v. Easley*, 192 Ill. 2d 307, 344 (2000). In essence, even if defense counsel errs in terms of trial strategy, tactics, or judgment, this will not render representation constitutionally defective. *People v. Perry*, 224 Ill. 2d 312, 355 (2007). "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *Id.* at 355-56.

¶ 54    To meet the second prong of prejudice, a defendant must show a reasonable probability, *i.e.*, "a probability sufficient to undermine confidence in the outcome," that, but for defense counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U.S. at 694; see also *People v. Houston*, 226 Ill. 2d 135, 144 (2007). Failure to show either deficient performance or sufficient prejudice defeats an ineffectiveness claim. *Strickland*, 466 U.S. at 687.

¶ 55    Defendant's contention of error is centered on counsel's failure to request a modification of an existing pattern instruction. We may not extend our evaluation of counsel's conduct into areas involving the exercise of judgment, discretion, or trial tactics even where this court would have acted differently. *People v. Mitchell*, 105 Ill. 2d 1, 12 (1984). In essence, ineffective assistance claims must be analyzed without "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Defense counsel's choice of jury instruction—including the decision not to object to an instruction—is considered a tactical decision, within the discretion of defense counsel. See, *e.g.*, *People v. Shlimon*, 232 Ill. App. 3d 449, 458 (1992); *People v. Houston*, 363 Ill. App. 3d 567, 576 (2006); *People v. Lostutter*, 227 Ill. App. 3d 1052, 1054 (1992); *People v. Jenkins*, 209 Ill. App. 3d 249, 258-60 (1991). Mistakes in strategy or tactics do not, with nothing more, amount to ineffectiveness of counsel. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994) ("In fact, counsel's strategic choices are virtually unchallengeable.").

¶ 56    With respect to jury instructions, if there is an applicable pattern instruction on a subject about which the trial court determines the jury should be instructed, "the trial court must use that instruction, unless the court determines that the instruction does not accurately state the law." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008) (citing Ill. S. Ct. R. 451(a) (eff. July 1, 2006)). "That

19

is, where a pattern instruction does not accurately state the law, Rule 451(a) authorizes the trial court to modify it." *Id.*

¶ 57    IPI Criminal No. 3.15 provides as follows:

> "When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:
>
> [1] The opportunity the witness had to view the offender at the time of the offense.
>
> [2] The witness's degree of attention at the time of the offense.
>
> [3] The witness's earlier description of the offender.
>
> [4] The level of certainty shown by the witness when confronting the defendant.
>
> [5] The length of time between the offense and the identification confrontation."  IPI Criminal No. 3.15.

The committee notes add in part the following:  "This new instruction simply lists factors well-established by case law.  [Citations.]"  IPI Criminal No. 3.15, Committee Note.  The note further directs trial courts to provide this instruction when identification is an issue and to provide the numbered paragraphs "that are supported by the evidence."  *Id.*

¶ 58    Whether defendant received ineffective assistance of counsel is a mixed question of fact and law.  *People v. Johnson*, 2021 IL 126291, ¶ 52 (citing *Strickland*, 466 U.S. at 698).  Therefore, although we must defer to the circuit court's factual findings, we review *de novo* the ultimate legal issue of whether counsel's omission supports an ineffective assistance claim.  *Id.*

¶ 59    Here, defendant contends that counsel was ineffective for failure to modify the instruction to remove the fourth factor, relating to the witness's level of certainty in identifying the defendant. Defendant adds that counsel should have also requested that three additional factors be included in the instruction:  (1) the use and presence of a weapon, (2) the stress of the event itself, and (3) exposure to pre- and post-event information.  We disagree.

¶ 60    With respect to the certainty factor, this court has previously noted that, although Illinois courts allow expert testimony that criticizes witness certainty as a reliability factor, our courts have also refused to prohibit a witness's certainty from being included as an appropriate factor in determining the overall reliability of that witness's identification.  See *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 34.  The *Guerrero* court concluded that our caselaw, in effect, provides a balanced approach, allowing witness certainty as a factor in determining the reliability of an identification while also allowing expert testimony criticizing that very factor.  *Id.*  We agree with this balanced approach, and defendant does not persuade us to abandon it.

¶ 61    With respect to the three factors defendant asserts his trial counsel should have added, the instruction itself provides that jurors "should consider all the facts and circumstances in evidence" when weighing the reliability of a witness's identification.  IPI Criminal No. 3.15.  The three additional factors defendant seeks to add would squarely fall under the "all the facts and circumstances" portion at the very beginning of the instruction.  It is well established that jury instructions must not be misleading or confusing (*People v. Bush*, 157 Ill. 2d 248, 254 (1993)), and pattern instructions were drafted with the goal that "all instructions be simple, brief, impartial and free from argument" through the use of "simple, brief and unslanted language so as to clearly and concisely state the law."  *People v. Haywood*, 82 Ill. 2d 540, 545 (1980).

¶ 62    In our view, removing one well-established factor and adding in the additional factors, as defendant claims counsel was constitutionally obligated to propose, would have resulted in instructions that failed to uphold the goal of a simple, brief instruction that clearly and concisely stated the law.  There would then be a substantial risk of misleading or confusing the jury.  For this reason, we cannot hold that counsel's failure to provide an edited—and thus non-pattern— jury instruction on a witness's identification testimony, was objectively reasonable, especially where a relevant pattern instruction existed.  See *Bannister*, 232 Ill. 2d at 81 (holding that a trial court "must" use the applicable pattern instruction unless the instruction does not accurately state the law).  Since the trial court would have denied trial counsel's request, counsel cannot be faulted for pursuing a futile request on a matter of trial strategy.  See *People v. Wilson*, 164 Ill. 2d 436, 454 (1994) (holding that trial counsel's failure to file a futile motion does not establish incompetent representation).

¶ 63    In addition, trial counsel's strategy was not so unsound that she entirely failed to conduct meaningful adversarial testing of the State's case.  *Perry*, 224 Ill. 2d at 355.  To the contrary, trial counsel thoroughly cross-examined the State's witnesses, in particular Ugalde and Chandler, highlighting the weaknesses in their testimonies.  She also elicited from Loftus' expert testimony the risks inherent in relying upon a witness's certainty to determine whether that witness's identification is reliable.  Defendant thus cannot meet the first prong of *Strickland*  and establish that counsel's performance was objectively unreasonable.

¶ 64    In addition, defendant's claim of ineffective assistance of counsel fails the prejudice prong.  As we have noted above, Chandler (defendant's girlfriend in Champaign) recounted to police defendant's confession to her that he shot and killed an older white man in Chicago.  Chandler added that defendant knew that the victim was going to collect money and intended to rob him of

22

it, and that defendant jumped out of some "bushes" when the robbery began. These facts align with the circumstances of the crime (the victim was an older white man who was shot to death), testimony of other witnesses (Henri Espinoza testified that he had given the victim $840 in rent), and other evidence (a photograph of the scene shows a dense cluster of trees near the north end of the property). In addition, Ugalde, an eyewitness to the shooting, identified defendant in court, in a physical lineup, and in a photo array as the shooter. Ugalde admitted that the event was stressful for him and that he clearly noticed the gun in defendant's hand, but he nonetheless testified that his ability to see defendant's face was "good." On these facts, we cannot hold that, even if counsel had successfully requested the various changes to IPI Criminal No. 3.15, that there is a reasonable probability that the result of defendant's trial would have been different. See *Strickland*, 466 U.S. at 694. Defendant's final contention of error is therefore unavailing.

¶ 65                              CONCLUSION

¶ 66    Although the trial court erred in denying defendant's motion to suppress his statements based upon his purported invocation of his right to remain silent, this error was harmless beyond a reasonable doubt. Defendant's trial counsel did not render ineffective assistance for failure to request a modification of a pattern jury instruction. Accordingly, we affirm the judgment of the circuit court.

¶ 67    Affirmed.